JENNIFER WALKER ELROD, Circuit Judge,
joined by STEWART, Chief Judge, and KING, DAVIS, DENNIS, PRADO, SOUTHWICK, HAYNES, GRAVES, and HIGGINSON, Circuit Judges:
This Title VII case arises out of alleged sexual harassment by Chuck Wolfe, the superintendent of an all-male crew on a construction site operated by Boh Bros. Construction Company (“Boh Brothers”). During a three-day jury trial, the Equal Employment Opportunity Commission (“EEOC”) presented evidence that Wolfe subjected Kerry Woods, an iron worker on Wolfe’s crew, to almost-daily verbal and physical harassment because Woods did not conform to Wolfe’s view of how a man should act. The jury found in favor of the EEOC on its hostile-environment claim, awarding compensatory and punitive damages. Boh Brothers appeals the district court’s denial of its motion for judgment as a matter of law and motion for new trial. Drawing all reasonable inferences in the light most favorable to the verdict, as we must, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.
I.
Woods is an iron worker and structural welder. Boh Brothers hired Woods on November 3, 2005, to work on crews repairing the Twin Spans bridges between New Orleans and Slidell after Hurricane Katrina. In January 2006, the company transferred Woods to a bridge-maintenance crew. Wolfe was the crew superintendent, with about five employees under his supervision.
The worksite was an undeniably vulgar place. Wolfe and the crew regularly used “very foul language” and “locker room talk.” According to other crew members, Wolfe was a primary offender: he was “rough” and “mouthy” with his co-workers and often teased and “ribbed on” them.
By April 2006, Woods had become a specific and frequent target of Wolfe’s abuse. Wolfe referred to Woods as “pu— y,” “princess,” and “fa — ot,” often “two to three times a day.” About two to three times per week — while Woods was bent over to perform a task — Wolfe approached him from behind and simulated anal intercourse with him. Woods felt “embarrassed and humiliated” by the name-calling and began to look over his shoulder before bending down. In addition, Wolfe *450 exposed his penis to Woods about ten times while urinating, sometimes waving at Woods and smiling.
One time, Wolfe approached Woods while Woods was napping in his locked car during a break. According to Woods, Wolfe “looked like he was zipping his pants” and said, “[i]f your door wouldn’t have been locked, my d-ck probably would have been in your mouth.” [1]
According to Wolfe, some of his teasing originated from Woods’s use of Wet Ones instead of toilet paper, which Wolfe viewed as “kind of gay” and “feminine.” In an interview with the EEOC, Wolfe explained:
Mr. Woods sat at a table with a bunch of iron workers and told us that he brought, you know, feminine wipes — not feminine wipes — but Wet Ones or whatever to work with him because he didn’t like it, didn’t like to use toilet paper. It’s [not] the kind of thing you’d want to say in front of a bunch [of] rough iron workers that they had there. They all picked on him about it. They said that’s kind of feminine to bring these, that’s for girls. To bring Wet Ones to work to wipe your ass, you damn sure don’t sit in front of a bunch of iron workers and tell them about it. You keep that to yourself if in fact that’s what you do.
Woods complained about Wolfe’s treatment to his foreman, Tim Carpenter, “two or three times.” Specifically, Woods said that he “didn’t like how [Wolfe] spoke to” him and asked Carpenter to reprimand Wolfe for urinating on the bridge. According to Woods, he elected not to complain about all of Wolfe’s behavior because he was afraid “to cause more of a conflict.”
Boh Brothers transferred Woods off of the bridge-maintenance crew to the Almo-naster yard, the central location for Boh Brothers work, after an incident in November 2006. According to Boh Brothers, Woods approached an inspector with Vol-kert Construction Services — an entity that oversaw the Twin Spans bridges site and approved Boh Brothers’s employees’ time records — and asked to see the maintenance crew’s time-sheets. Boh Brothers’s policy prohibited an employee from viewing his co-workers’ time-sheets, and Woods’s purported attempt to do so was a terminable offense. The inspector reported Woods’s conduct to Wolfe. Wolfe, in turn, notified Wayne Duckworth, the general superintendent for Boh Brothers’s Heavy Highway Department, adding that he “didn’t care for” Woods because he was “different” and “didn’t fit in.” Wolfe testified that, at that point, he was “done with” Woods.
The next morning, Wolfe told Woods to meet with Duckworth. At the meeting, Woods complained in detail about Wolfe’s harassment. In addition, Woods told Duckworth that Wolfe was “probably stealing company gas and shrimping on company time.” According to Woods, Duckworth never mentioned anything about Woods’s alleged attempt to see his co-workers’ time-sheets or indicated that Woods had committed any other violation of Boh Brothers’s policy. At the end of the conversation, Duckworth indicated that he would “look into” the alleged harassment. He sent Woods home without pay because, according to Duckworth, he feared “further problems” between Woods and Wolfe. Woods, believing that he had been fired, called Carpenter and asked him to intervene and “see if he could put *451 [Woods] to work.” Two days later, Carpenter called Woods and told him to report to work at the Almonaster yard.
Duckworth subsequently investigated Woods’s complaint, although he did not document any aspect of his investigation. He spoke with both Wolfe and a crew foreman for about ten minutes each and determined that Wolfe’s behavior, though unprofessional, did not constitute sexual harassment. Duckworth did not notify the company’s general counsel about Woods’s harassment allegations. He did, however, arrange a thorough investigation of Woods’s claim that Wolfe stole company gas and used company equipment for personal purposes. Boh Brothers hired a private detective agency to evaluate the issue, resulting in 84.75 hours of work and two reports.[2]
Woods initially filed an EEOC charge questionnaire in November 2006, shortly after his removal from the Twin Spans maintenance crew, alleging he had been “fired” from that job and, three days later, hired to work at a different Boh Brothers location. In February 2007, Boh Brothers laid Woods off for lack of work. That March, Woods filed an EEOC charge of discrimination, alleging sexual harassment and, on the basis of his November 2006 removal from the maintenance crew, retaliation.
The EEOC brought this enforcement action on Woods’s behalf in September 2009, claiming sexual harassment and retaliation under Title VII. Following a three-day trial, the jury returned a verdict in favor of Woods on the harassment claim and in favor of Boh Brothers on the retaliation claim. The jury awarded Woods $201,000 in compensatory damages and $250,000 in punitive damages. The district court reduced the compensatory damages award to $50,000 to comply with the $300,000 statutory damages cap. 42 U.S.C. § 1981a(b)(3)(D). Boh Brothers filed a renewed motion for judgment as a matter of law following entry of judgment and a motion for new trial, both of which the court denied. Boh Brothers timely appealed.
A panel of this court overturned the jury verdict. According to the panel, the evidence was insufficient as a matter of law to sustain the jury’s finding that Wolfe discriminated against Woods “because of ... sex” in violation of Title VII. EEOC v. Boh Bros. Constr. Co., L.L.C., 689 F.3d 458, 459 (5th Cir.2012). The EEOC subsequently sought and obtained en banc review.
II.
“[0]ur standard of review with respect to a jury verdict is especially deferential.” SMI Owen Steel Co., Inc. v. Marsh U.S.A., Inc., 520 F.3d 432, 437 (5th Cir.2008) (quoting Flowers v. S. Reg’l Physician Servs., Inc., 247 F.3d 229, 235 (5th Cir.2001)) (internal quotation marks omitted). Although we review the denial of a motion for judgment as a matter of law de novo, we apply the same legal standard as the district court. Baisden v. I’m, Ready Prods., Inc., 693 F.3d 491, 498 (5th Cir.2012), cert. denied, — U.S. -, 133 S.Ct. 1585, 185 L.Ed.2d 578 (2013) (citation omitted). Under that standard, a litigant cannot obtain judgment as a matter of law “unless the facts and inferences point ‘so strongly and overwhelmingly in the mov-ant’s favor that reasonable jurors could not reach a contrary conclusion.’ ” Id. (quoting Flowers, 247 F.3d at 235). As the D.C. Circuit has eloquently explained:
*452 We are not to tamper lightly with the considered judgment of those drawn together at one point in time to render a judgment that is representative of the good common sense of the American people. It goes without saying that few institutions are as venerable as that of trial by jury, enshrined at the Founding in the Bill of Rights and hallowed by an enormous body of English and American law that commands judges, who are of all officials the least accountable to the people, not to invade the province of judgment by the people.
Stacey v. Allied Stores Corp., 768 F.2d 402, 406 (D.C.Cir.1985).
Thus, we must draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that we might regard as more reasonable. Westlake Petrochems., L.L.C. v. United Polychem, Inc., 688 F.3d 232, 239 (5th Cir.2012). For “it is the function of the jury as the traditional finder of the facts, and not for the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.” Roman v. W. Mfg., Inc., 691 F.3d 686, 692 (5th Cir.2012) (quoting Mosley v. Excel Corp., 109 F.3d 1006, 1009 (5th Cir.1997)). The jury is “free to choose among reasonable constructions of the evidence.” United States v. Ramos-Cardenas, 524 F.3d 600, 605 (5th Cir.2008). Thus, we “cannot reverse a denial of a motion for judgment as a matter of law unless the jury’s factual findings are not supported by substantial evidence, or if the legal conclusions implied from the jury’s verdict cannot in law be supported by those findings.” Am. Home Assurance Co. v. United Space Alliance, LLC, 378 F.3d 482, 488 (5th Cir.2004).
III.
This appeal involves the EEOC’s hostile-work-environment claim pursuant to Title VII of the Civil Rights Act of 1964. See 42 U.S.C. § 2000e-2(a)(l). Title VII makes it “an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin.” Id. “The creation of a hostile work environment through harassment ... is a form of proscribed discrimination.” Vance v. Ball State Univ., — U.S. -, 133 S.Ct. 2434, 2455, 186 L.Ed.2d 565 (2013) (Thomas, J., concurring) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); Meritor Sav. Bank, F.S.B. v. Vinson, 477 U.S. 57, 64-65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).
 Under Title VII, an employer’s liability for workplace harassment depends on the status of the harasser:
If the harassing employee is the victim’s co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a “supervisor,” however, different rules apply. If the supervisor’s harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. Under this framework, therefore, it matters whether a harasser is a “supervisor” or simply a co-worker.
Id. at 2439 (citations omitted). An employee is a supervisor if “he or she is empowered by the employer to take tangi *453 ble employment actions against the victim.” Id.[3]
Where a harassment claim arises out of a supervisor’s conduct, “there are four elements of a hostile working environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on [a protected characteristic]; and (4) that the harassment affected a ‘term, condition, or privilege’ of employment.” Lauderdale v. Tex. Dep’t of Criminal Justice, 512 F.3d 157, 162-63 (5th Cir.2007). To affect a term, condition, or privilege of employment, the harassing conduct “must be sufficiently severe or pervasive to alter the conditions of [the victim’s] employment and create an abusive working environment.” Aryain v. Wal-Mart Stores of Tex., L.P., 534 F.3d 473, 479 (5th Cir.2008) (alteration in original) (quoting Lauder-dale, 512 F.3d at 163). We use an objective “reasonable person” standard to evaluate severity and pervasiveness. Oncale, 523 U.S. at 82, 118 S.Ct. 998. Ultimately, whether an environment is hostile or abusive depends on the totality of circumstances. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
In the context of same-sex discrimination, we typically analyze these elements by way of a two-step inquiry. La Day v. Catalyst Tech., Inc., 302 F.3d 474, 478 (5th Cir.2002). First, we consider whether the alleged conduct was sex discrimination and, second, we evaluate whether the conduct meets the standard for a quid pro quo or hostile-work-environment claim. Id. “For example, same-sex harassment that is ‘severe or pervasive’ enough to create a hostile environment might be excluded from the coverage of [T]itle VII because it was not discriminatory on the basis of sex.” Id. (citation omitted). Or, “[o]n the other hand, same-sex harassment that is indisputably discriminatory might not be serious enough to make out either a quid pro quo or hostile environment claim.” Id. (citation omitted).
Applying this inquiry here, the most critical issues on appeal are whether the EEOC presented sufficient evidence that (1) Wolfe harassed Woods “because of ... sex” as required by Title VII, and (2) Wolfe’s harassment was severe or pervasive. We turn to the beeause-of-sex issue first.
A.
At trial, the EEOC relied on gender-stereotyping evidence to prove that Woods suffered discrimination on the basis of sex. Specifically, the EEOC asserted that Wolfe harassed Woods because Woods was not a manly-enough man in Wolfe’s eyes. On appeal, Boh Brothers argues that (1) the EEOC cannot, as a matter of law, rely on gender-stereotyping evidence to establish a same-sex harassment claim, and (2) even if it could, the evidence here was insufficient to sustain the jury verdict. As explained below, both of these arguments fail.
1.
More than two decades ago, the Supreme Court held that a plaintiff may rely on gender-stereotyping evidence to show that discrimination occurred “because of ... sex” in accordance with Title VII. See Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In Price Waterhouse, a woman with an “aggressive” personality sued after *454 her accounting firm passed her up for partnership. Id. at 235, 109 S.Ct. 1775. The Court saw “clear signs ... that some of the partners reacted negatively to [the plaintiffs] personality because she was a woman. One partner described her as ‘macho’; another suggested that she ‘overcompensated for being a woman’; a third advised her to take ‘a course at charm school.’ ” Id. (citations omitted). The plaintiffs evaluators suggested that she should “walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.” Id. (citation and internal quotation marks omitted). The Court declared:
[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.
Id. at 251, 109 S.Ct. 1775 (internal quotation marks, alteration, and citations omitted). Thus, while “[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision,” they “can certainly be evidence that gender played a part.” Id.
Following this pronouncement, numerous courts, including ours, have recognized that a plaintiff can satisfy Title YII’s because-of-sex requirement with evidence of a plaintiffs perceived failure to conform to traditional gender stereotypes. See, e.g., Davis v. Chevron U.S.A., Inc., 14 F.3d 1082, 1085 (5th Cir.1994) (noting that the offensive comments in Price Waterhouse “cannot reasonably be interpreted as anything other than a reflection of [gender-based] bias”).[4]
Nine years after Price Waterhouse, a unanimous Supreme Court held that “nothing in Title VII necessarily bars a claim of discrimination ‘because of ... sex’ merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex.” Oncale, 523 U.S. at 79, 118 S.Ct. 998. While “male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII,” the Court acknowledged that “statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.” Id. The Oncale Court emphasized that Title VII is not a general civility code for the American workplace, regardless of whether opposite-sex or same-sex harassment is at *455 issue. Id at 80, 118 S.Ct. 998. In either case, a plaintiff must prove that the discrimination occurred because of sex and that the harasser’s behavior was so objectively offensive as to alter the conditions of his or her employment. Id. at 80-81, 118 S.Ct. 998. With this well-settled legal standard in mind, we reject the argument in Judge Jones’s dissent that this opinion would require employers to “purge every workplace of speech and gestures that might be viewed in any way as tokens of sex discrimination.” As the Supreme Court has emphasized, “[wjhatever eviden-tiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted ‘discriminaftion] ... because of ... sex.’ ” Id. (first emphasis added).[5]
The Oncale court charted three eviden-tiary paths for plaintiffs to make this showing in the context of a same-sex harassment claim: (1) a plaintiff may show that the harasser was homosexual and motivated by sexual desire; (2) a plaintiff may show that the harassment was framed “in such sex-specific and derogatory terms ... as to make it clear that the harasser [was] motivated by general hostility to the presence” of a particular gender in the workplace; and (8) a plaintiff may “offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.” Id. Boh Brothers argues that these three routes are the exclusive paths to success on a Title VII same-sex harassment claim. Our sister circuits uniformly disagree.[6] Every circuit to squarely consider the issue has held that the Oncale categories are illustrative, not exhaustive, in nature. Considering that the Court used “for example” and “[w]hatever evidentiary route the *456 plaintiff chooses to follow” in its discussion of those categories, we agree. See id. at 80-81,118 S.Ct. 998.
In sum, nothing in Oncale overturns or otherwise upsets the Court’s holding in Price Waterhouse: a plaintiff may establish a sexual harassment claim with evidence of sex-stereotyping.[7] Thus, the EEOC may rely on evidence that Wolfe viewed Woods as insufficiently masculine to prove its Title VII claim.[8]
2.
Boh Brothers further argues that, even if the EEOC’s sex-stereotyping theory is cognizable in this context, the evidence is insufficient to support the jury’s finding that Wolfe harassed Woods “because of ... sex.” We disagree.
In conducting this intent-based inquiry, we focus on the alleged harasser’s subjective perception of the victim. Thus, even an employer’s wrong or ill-informed assumptions about its employee may form the basis of a discrimination claim. See, e.g., Black v. Pan Am. Labs., L.L.C., 646 F.3d 254, 260 (5th Cir.2011) (affirming a jury verdict in favor of a female sexual-harassment plaintiff who introduced evidence that decision-makers made sex-based comments — that “women [are] a detriment to the company,” women “get hired on, get married, and/or get pregnant and they leave,” and that the plaintiff did not need to worry about her sales quota because “it shouldn’t matter to you, you’re not the breadwinner anyway” — without requiring the plaintiff to show that her harasser’s obviously sexist perceptions were true); EEOC v. WC&M Enters., Inc., 496 F.3d 393, 401-02 (5th Cir.2007) (holding that a Muslim man’s national-origin discrimination claim survived summary judgment even though his harassers did not know his country of origin) (collecting cases).[9] We do not require a plaintiff to *457 prop up his employer’s subjective discriminatory animus by proving that it was rooted in some objective truth; here, for example, that Woods was not, in fact, “manly.”[10] Rather, in considering the motivation behind a harasser’s behavior, we look to evidence of the harasser’s subjective view of the victim.[11]
Applying these principles here, and drawing all reasonable inferences in the light most favorable to the verdict, there is enough evidence to support the jury’s conclusion that Wolfe harassed Woods because of sex. Specifically, the EEOC offered evidence that Wolfe, the crew superintendent, thought that Woods was not a manly-enough man and taunted him tirelessly. Wolfe called Woods sex-based epithets like “fa — ot,” “pu — y,” and “princess,” often “two to three times” per day.[12] Wolfe himself admitted that these epithets were directed at Woods’s masculinity:
Q. Now, when you said that Mr. Woods was kind of gay for using Wet Ones, you were saying that he was feminine; is that correct?
A. I didn’t say he was gay. Said it ... seemed kind of gay ....
Q. So you wouldn’t say that he was gay, but you say his conduct was kind of gay?
A. Yes, sir[.]
Q. By saying that, you were saying he was feminine; correct?
A. Yes.
Q. You meant he was not being manly; is that correct?
A. Yes, sir.
*458 Q. When you said that Mr. Woods’[s] conduct sounded like a homo, that again refers to Mr. Woods being feminine for using Wet Ones; is that correct?
A. Yes, sir....
Q. And ... when you were talking with the EEOC investigator about the wet wipes or the Wet Ones, you initially called them feminine wipes; correct?
A. Yes, sir. I believe I did.
Q. And that’s because you believed that Wet Ones [are] something that girls should use but men should not?
A. Or babies, yeah, that’s correct.
Q. So you had stereotypes of how a man should act, and Mr. Woods didn’t fit in to those stereotypes because he used Wet Ones and then talked about it in front of a bunch of hairy iron workers; correct?
A. I don’t agree with that, no, no. He was an iron worker just like the rest of [t]hem. He performed and did his job just like everyone else. We was just playing....
Q. Let me draw your attention to testimony that you gave in your sworn interview. ... [“Mr. Woods sat at a table with a bunch of iron workers and told us that he brought, you know, feminine wipes — not feminine wipes but Wet Ones or whatever to work with him because he didn’t like it, didn’t like to use toilet paper. It’s [not] the kind of thing you’d want to say in front [of] a bunch rough iron workers that they had there. They all picked on him about it. They said that’s kind of feminine to bring these, that’s for girls. To bring Wet Ones to work to wipe your ass, you damn sure don’t sit in front of a bunch of iron workers and tell them about it. You keep that to yourself if in fact that’s what you do.”] Was that truthful testimony?
A. Yes, sir.
Q. You also called Mr. Woods princess; correct?
A. Yes, sir.
Q. And, when you called him princess, that related to the fact that you thought he was feminine; correct?
A. I guess so, yes, sir-
Q. So the only iron worker that you ever called queer was Mr. Woods?
A. I’m thinking so.
Q. And was Mr. Woods the only iron worker that you called fa — ot?
A. I’m not sure.
Q. Do you understand the word queer to be a slang for homosexual?
A. Yes, I do. I just don’t remember if I used it for anyone else, too. I may have.
Q. And you understand that the word fa — ot is a slang for homosexual?
A. Yes.
Q. And you called Mr. Woods those words because you thought he was feminine; correct?
A. No, sir. I was just playing with him. I did not think he was queer or homosexual. Never did, do not now.
Q. You called him those words because you thought his using wet wipes was feminine; correct?
A. Yes, sir.
Q. And you admit that you called Mr. Woods pu — y; correct?
A. Yes, sir.
Q. And, in your experience, is that a slang word that one would use for a man who is not manly?
A. Guess so.
Q. So all the allegations by Mr. Woods about the names that you called him that related to his being feminine because he used the Wet Ones, those allegations are all true; correct?
*459 A. Yes.
In addition to this name-calling, Wolfe mocked Woods with several other sexual-ized acts. For example, Woods testified that Wolfe would approach him from behind and “hump” him two to three times per week (which equates to more than 60 instances of simulated anal sex), that Wolfe exposed his genitals to Woods (sometimes while smiling and waving) about ten times, and that Wolfe suggested that he would put his penis in Woods’s mouth.[13]
Viewing the record as a whole, a jury could view Wolfe’s behavior as an attempt to denigrate Woods because — at least in Wolfe’s view — Woods fell outside of Wolfe’s manly-man stereotype.[14] Thus, we *460 cannot say that no reasonable juror could have found that Woods suffered harassment because of his sex. Having reached this conclusion, we turn to the second critical question on appeal: whether the alleged abuse was sufficiently severe or pervasive to support Title VII liability.
B.
Boh Brothers asserts that, even if Wolfe harassed Woods because of sex, the district court should have granted its Rule 50(b) motion because Wolfe’s harassment was not severe or pervasive as a matter of law.
As the Supreme Court has explained, Title VII is not “a general civility code for the American workplace.” Oncale, 523 U.S. at 80, 118 S.Ct. 998. Thus, we view the alleged harassment with “[c]ommon sense, and an appropriate sensitivity to social context” to determine whether it constitutes “conduct which a reasonable person in the plaintiffs position would find severely hostile or abusive.”[15] Id. at 82, 118 S.Ct. 998. This inquiry is necessarily fact-specific. See Alaniz v. Zamora-Quezada, 591 F.3d 761, 771 (5th Cir.2009).
Here, the jury was well-instructed on this governing standard:
For Defendant to be liable for sexual harassment, the conduct must be sufficiently severe or pervasive to alter the terms or conditions of Plaintiffs employment and create a hostile or abusive work environment. To determine whether the conduct in this case rises to a level that alters the terms or conditions of Plaintiffs employment, you should consider all the circumstances, including: the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;- and whether it unreasonably interferes with Plaintiffs work performance. There is no requirement that the conduct be psychologically injurious.
Although sexual harassment must be based on sex, it need not be motivated by sexual desire. Sexual harassment *461 may include extremely insensitive conduct because of sex/gender. Simple teasing, offhand comments, sporadic use of offensive language, occasional gender-related jokes, and isolated incidents (unless extremely serious) will generally not amount to discriminatory changes in the terms and conditions of employment. Discriminatory intimidation, ridicule, sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature in the workplace may be sufficiently extreme to alter the terms and conditions of employment.
Hearing this instruction, the jury concluded that Wolfe’s harassment of Woods was sufficiently severe or pervasive to satisfy the governing standard. There is enough evidence in the record to support the jury’s conclusion.
Woods specifically testified that he was a unique and constant target of Wolfe’s abuse.[16] For example, Woods testified on direct examination:
Q. In your experience, is it common on a construction site for this type of behavior you’ve described to take place?
A. No.
Q. Has any supervisor ever treated you like this at any other job you’ve held?
A. No.
Q. Has anybody ever treated you like this on any job you’ve held?
A. No.
Q. In your opinion, did Mr. Wolfe treat the other members of the maintenance crew the same way he treated you?
A. No.
Q. What was the difference?
A. He treated them — he treated them more like you’re supposed to treat a grown man. He didn’t pick — he didn’t harass them like he harassed me all the time.
Q. Did you ever see Mr. Wolfe show somebody else his penis?
A. No.
Q. Did you ever hear Mr. Wolfe say anything about putting his penis in somebody’s mouth to somebody else?
A. No.
Wolfe himself conceded that he called only Woods “queer”; he did not recall whether he called anyone else “fa — ot,” a name he used regarding Woods on a consistent basis. This, alongside all of the evidence discussed above in Section 111(A) — the repeated humping, the reference to oral sex, etc. — is sufficient for a reasonable juror to conclude that Wolfe’s harassment was sufficiently severe or pervasive to alter the conditions of Woods’s employment.[17] Wolfe hurled raw sex-based epithets uniquely at Woods two-to-three times a day, almost every day, for months on end. We have upheld a jury verdict on analogous facts. See, e.g., Farpella-Crosby v. Horizon Health Care, 97 F.3d 803, 806 (5th Cir.1996) (plaintiff presented sufficient evidence from which a jury could find severe or pervasive harassment where *462 plaintiff was subjected to offensive, sex-based comments two to three times per week); cf. WC&M Enters., 496 F.3d at 400 (reversing summary judgment in favor of a defendant where a plaintiff was subjected to verbal harassment — including nicknames like “Taliban” and “Arab” — on “a regular basis for a period of approximately one year”); Walker v. Thompson, 214 F.3d 615, 626 (5th Cir.2000) (holding that African-American employees who were subjected to a variety of racial slurs over a three-year period raised a fact issue as to whether slurs were sufficiently severe or pervasive), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Accordingly, we conclude that there was sufficient evidence for a reasonable juror to conclude that Wolfe’s harassment of Woods was severe or pervasive.[18]
IV.
Having decided that the evidence is sufficient to support the EEOC’s Title VII claim, we turn to Boh Brothers’s alternative arguments, evaluating whether the company established its Ellerth/Faragher affirmative defense, whether the evidence is sufficient to support the jury’s punitive damages award, and whether the district court properly awarded injunctive relief in favor of the EEOC.
A.
Boh Brothers argues that it established an Ellerth/Faragher affirmative defense as a matter of law. See Burlington Indus. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Under this defense, an employer will not be vicariously liable for harassment by a supervisor if it can show: “(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.” Watts v. Kroger Co., 170 F.3d 505, 509-10 (5th Cir.1999) (quoting Faragher, 524 U.S. at 807, 118 S.Ct. 2275) (internal quotation marks omitted). The employer bears the burden to prove both elements by a preponderance of the evidence. Aryain, 534 F.3d at 483 (citing Ellerth, 524 U.S. at 765, 118 S.Ct. 2257). In analyzing the evidence, we draw all reasonable inferences in the light most favorable to the verdict. Westlake Petrochems., 688 F.3d at 239.
The jury expressly rejected Boh Brothers’s Ellerth/Faragher defense at trial. The interrogatories submitted to the jury asked whether Boh Brothers satisfied the individual elements of the defense, and the jury answered “no” regarding both. We begin and end our analysis with the first prong: whether Boh Brothers established that it exercised reasonable care to prevent and promptly correct Wolfe’s sexually harassing behavior.
An employer can satisfy the first prong of the Ellerth/Faragher defense by implementing suitable institutional policies and educational programs regarding *463 sexual harassment. See, e.g., Lauderdale, 512 F.3d at 164; Wyatt v. Hunt Plywood Co., 297 F.3d 405, 413 (5th Cir.2002). As the Supreme Court noted in Ellerth, “[w]hile proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.” 524 U.S. at 765, 118 S.Ct. 2257. Thus, we often look to an employer’s policies and programs in determining whether it took reasonable measures to prevent discriminatory behavior. See, e.g., Harvill v. Westward Commc’ns, L.L.C., 433 F.3d 428, 437-39 (5th Cir.2005); Hockman v. Westward Commc’ns, L.L.C., 407 F.3d 317, 329-30 (5th Cir.2004). Not every policy eliminates liability; generic policies that offer no specific complaint procedure may be insufficient to satisfy the Ellerth/Faragher defense.[19] See, e.g., Walker, 214 F.3d at 627, abrogated on other grounds by Burlington, 548 U.S. at 67, 126 S.Ct. 2405 (“It is undisputed that the Glasfloss employee handbook contained an EEOC policy statement against discrimination, however, it appears that Glasfloss had not promulgated a complaint procedure specifically to address racial harassment.” (footnote omitted)).
Here, although Boh Brothers maintained a broad nondiscrimination policy (the “EEO Statement”), it offered no specific guidance regarding sexual harassment. Rather, it offered generic statements such as “[a]ll personnel actions including, but not limited to, compensation, benefits, transfers, layoffs ..., will be administered without regard to race, color, religion, disability, sex, or national origins” and “[a]ll working conditions will be maintained in a non-discriminatory manner.”[20] *464 As John F. Lipiani, Boh Brothers’s in-house counsel, testified, Boh Brothers “did not put out a lot of definitions about anything.” But even if the EEO Statement had included content relevant to sexual harassment — which it did not — Boh Brothers employees were not aware of the policy. Woods testified that he did not recall seeing any documents regarding discrimination at the time he was hired, and other employees indicated that they never read the notices that Boh Brothers posted in a “shack” on the work site.[21] Both Wolfe and Duckworth testified that they did not understand that conduct unmotivated by sexual desire could constitute sexual harassment.
Moreover, Boh Brothers’s nondiscrimination policies offered employees no specific instructions regarding how to assert or investigate harassment complaints. The EEO Statement indicated: “The company has designated one of its officers, Mr. John F. Lipiani ... as Equal Employment Opportunity Officer to coordinate Company efforts and to advise and assist all personnel in implementing this policy.” This language focuses on policy implementation, but says nothing regarding how or to whom an employee should report a harassment claim. In addition, Boh Brothers failed to provide its supervisors with any guidance regarding how to investigate, document, and resolve harassment complaints once they were reported.[22] According to Lipiani, the company merely advised supervisors to call him with questions regarding how to investigate a complaint: “We didn’t tell them exactly what to do. We told them to call when they needed help. To call me.”
The record further demonstrates that Boh Brothers did little else to implement *465 its nondiscrimination policies.[23] Duck-worth, the general superintendent for Boh Brothers’s Heavy Highway Department, testified that he received about five minutes of sexual-harassment training per year and did not understand that sexual harassment included conduct that was not motivated by sexual desire.[24] Despite his status as a supervisor, Wolfe testified that he did not receive any formal employment-discrimination training, other than receiving a general ethics code after Woods’s harassment. According to Wolfe, he did not understand that his use of sex-based epithets, exposure of his genitals, and humping of Woods from behind either violated a company policy or constituted sexual harassment.
Beyond these policy failures, it is important that Woods’s complaint to Duckworth resulted in what the jury reasonably could have viewed as a belated and cursory twenty-minute investigation, along with arguably poor treatment of the alleged victim vis-a-vis the alleged harasser.[25] Duckworth took no notes and asked no questions during his meeting with Woods. Upon hearing Woods’s complaint, Duck-worth sent Woods — the alleged harassment victim — home with no pay for three days because he was afraid that further problems would occur between the two men, leading Woods to assume that he had been fired.[26] Duckworth never in *466 formed Lipiani of the complaint and sought no advice regarding how to handle the matter. Indeed, a reasonable juror could have concluded that Duckworth waited for a few months before he even discussed the matter with Wolfe and Carpenter. When the meetings did occur, they lasted for approximately ten minutes each.
In contrast to his investigation of Woods’s sexual harassment complaint, Duckworth investigated Woods’s other allegation — that Wolfe misused company resources — in great detail. The company hired a private detective to investigate the allegations, resulting in 84.75 hours of work and two reports. As the EEOC emphasized in its opening statement: “Defendant does know how to investigate misconduct it cares about.... [W]hen defendant takes a complaint seriously, they investigate it seriously. They hired a private investigator to determine whether Wolfe was violating company policies. Yet, they spent no more than 20 minutes investigating when Mr. Woods complained about egregious sexual harassment.”
Finally, Boh Brothers at least arguably failed to punish Wolfe for his harassment of Woods. Wolfe testified that he never received any “write-up” for his treatment of Woods. And although Wolfe eventually suffered a demotion, Duckworth never said that the demotion had to do with Wolfe’s treatment of Woods. Rather, the conversation centered on “the safety issues and the suspicion of improprieties with the equipment and explaining to [Wolfe] that he wanted to handle himself in a more professional manner in regards to safety.”
Considering these facts and drawing all reasonable inferences in the light most favorable to the verdict, we cannot say that no reasonable juror could have found that Boh Brothers failed to take reasonable measures to prevent and correct Woods’s harassment.
Because the two prongs of the El-lerth/Faragher affirmative defense are conjunctive and there is sufficient evidence to support the jury’s determination on prong one, we need not consider prong two: whether Woods satisfied his duty to take full advantage of his employer’s preventative and corrective measures.[27] We note that the evidence was thin on this prong: Woods’s initial informal complaints to Carpenter made no reference to sexual harassment, and Woods did not raise the issue with Duckworth until months later, after he thought he had been fired for an unrelated incident.
Had Boh Brothers adopted suitable institutional policies and educational programs regarding sexual harassment, it may have avoided liability. Because a reasonable juror could have concluded that it did not, we uphold the jury’s rejection of Boh Brothers’s Ellerth/Faragher affirmative defense.[28]
*467 B.
Having decided that the evidence supports the jury’s liability finding, we turn next to whether it supports the jury’s punitive damages award. A Title VII plaintiff may recover punitive damages upon proof that the defendant acted “with malice or with reckless indifference to the federally protected rights of an aggrieved individual.” 42 U.S.C. § 1981a(b)(1). This is a higher standard than the showing necessary for compensatory damages, satisfied in “only a subset of cases involving intentional discrimination.” Kolstad v. Am. Dental Ass’n, 527 U.S. 526, 534, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Thus, “not every sufficient proof of pretext and discrimination is sufficient proof of malice or reckless indifference.” Hardin v. Caterpillar, Inc., 227 F.3d 268, 270 (5th Cir.2000).[29] Moreover, even if particular agents acted with malice or reckless indifference, an employer may avoid vicarious punitive damages liability if it can show that it made good-faith efforts to comply with Title VII.[30] Kolstad, 527 U.S. at 545-46, 119 S.Ct. 2118. Given these stringent standards, a plaintiff faces what our sister circuit has called a “formidable burden” in seeking punitive damages for employment discrimination. Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc., 439 F.3d 894, 903 (8th Cir.2006) (internal quotation marks omitted).
Ultimately, the terms “malice” and “reckless indifference” “focus on the *468 actor’s state of mind.” Kolstad, 527 U.S. at 535, 119 S.Ct. 2118. Both “pertain to the employer’s knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.” Id. Thus, the defendant employer “must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable for punitive damages.” Id. at 536, 119 S.Ct. 2118. Even intentional discrimination may not meet this standard where the employer is “unaware of the relevant federal prohibition” or “discriminates with the distinct belief that its discrimination is lawful.” Id. at 537,119 S.Ct. 2118. For example, punitive damages may not be appropriate where the underlying theory of discrimination is “novel or otherwise poorly recognized.” Id. at 536-37,119 S.Ct. 2118.
Here, although we affirm the jury’s finding that Boh Brothers engaged in intentional discrimination, the EEOC cannot meet the higher burden to show that it did so “in the face of a perceived risk” that its actions would “violate federal law.” See id. at 536, 119 S.Ct. 2118 (emphasis added). In investigating Woods’s complaint, Duckworth’s understanding was that sexual harassment was illegal only if it involved “unwanted advances” or “sexual desire.” When asked: “You didn’t think that Mr. Wolfe was sexually harassing Mr. Woods because you don’t think that Mr. Wolfe has any interest in guys; correct?” Duckworth answered: ‘Tes.” Likewise, when the EEOC asked Wolfe: “You never learned that it was against the law for a male supervisor to sexually harass a male employee until after Mr. Woods left Boh Brothers; is that correct?” Wolfe answered: “That’s correct.” When asked: ‘Tour current understanding about the company’s policies on sexual harassment is that same-sex harassment only happens where a male supervisor abuses an employee because the employee is a homosexual; is that right?” Wolfe answered: “That’s what I thought at the time.” The EEOC offered nothing to rebut this testimony. Thus, the uncontroverted evidence shows that neither Wolfe nor Duckworth subjectively understood that male-on-male sexual harassment, based on something other than sexual desire, was sufficient to violate federal law.
Although the federal law at issue in this case — most importantly, Price Waterhouse and Oncale — is not new, we had not directly addressed whether a plaintiff could rely on evidence of gender-stereotyping in a same-sex discrimination case at the time of Wolfe’s harassment. Thus, while Wolfe and Duckworth’s subjective understandings of same-sex harassment, and Boh Brothers’s failure to train its employees regarding the issue, may have been ill-advised, it was not malicious or recklessly indifferent.[31] Because the uncontroverted evidence shows that Boh Brothers did not subjectively perceive a risk of violation of federal law, we conclude that Boh Brothers was entitled to judgment as a matter of law overturning the jury’s punitive-damages award.
We note, however, that this holding upsets the district court’s compensatory-damages award. The jury awarded a total of $451,000 in damages: $201,000 compensatory[32] and $250,000 punitive. But 42 U.S.C. § 1981 a(b)(3)(D) caps the *469 available damages at $300,000.[33] To comply with this cap, the district court reduced the EEOC’s compensatory damages to $50,000 and left the punitive damages intact, resulting in a $300,000 judgment against Boh Brothers.
It appears from the record that the district court decided to reduce the EEOC’s compensatory damages, rather than its punitive damages, for two reasons. First, the EEOC advocated this approach based on Abner v. Kansas City Southern Railroad Co., 513 F.3d 154, 164 (5th Cir.2008), which it relied on for the proposition that the district court lacked discretion to reduce a punitive-damages award that fell below the statutory cap.[34] Second, the district court expressed some hesitation regarding the jury’s compensatory-damages award. On this record, it is unclear whether the district court would have awarded the EEOC the entire $201,000 compensatory-damages amount absent the statutory-damages cap. Accordingly, we remand to the district court to consider in the first instance whether the evidence is sufficient to support the jury’s $201,000 compensatory damages finding. Having presided over the trial and heard the evidence directly, the district court judge is in the best position to assess this issue.[35]
We turn finally to Boh Brothers’s last argument: that the district court erred in awarding the EEOC injunctive relief and that, in any event, the scope of the injunction was too broad.
C.
As Boh Brothers recognizes, injunctive relief is mandatory in the wake *470 of a Title VII violation “absent clear and convincing proof of no reasonable probability of further noncompliance with the law.” Serv. Temps Inc., 679 F.3d at 338 n. 51 (quoting James v. Stockkam Valves & Fittings Co., 559 F.2d 310, 354 (5th Cir.1977) and citing EEOC v. Rogers Bros., Inc., 470 F.2d 965, 966-67 (5th Cir.1972)). We review the scope of the injunction for abuse of discretion. Id. at 338.
Here, the district court held that Boh Brothers failed to demonstrate, by clear and convincing evidence, that future violations of Title VII were not reasonably likely to occur. Considering the evidence discussed in Sections III and IV(A) above, we agree. Although Boh Brothers complains that the injunction is too broad, it does not specifically articulate how. That is, Boh Brothers does not explain which particular provisions of the injunction are excessive and unnecessary to prevent future violations. Moreover, as the district court noted, Boh Brothers offered “no sworn testimony to support its claims” that the injunction was unreasonable and overly burdensome. Thus, on this record, Boh Brothers has not met its burden to show that the district court abused its discretion with respect to the scope of the injunction. The injunction is reasonably tailored to address deficiencies in Boh Brothers’s sexual harassment policies, inform and train employees regarding the relevant law, and prevent similar conduct from recurring. Accordingly, we affirm the issuance and content of the injunction.
V.
We will overturn a jury verdict on sufficiency grounds only in the rare circumstance that the contrary facts and inferences are so strong that a reasonable person could not reach the same conclusion. Applying this bedrock principle here, we AFFIRM in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.

. Wolfe also made a lewd comment about Woods’s daughter — "You better hope your daughter don't ever grow up and become a stripper because I won’t tip her”: — which made Woods cry.

. After receiving the agency's report, Boh Brothers demoted Wolfe temporarily but did not reduce his pay.

. Wolfe testified that he had the authority to fire, discipline, and transfer employees during the relevant period — qualifying him as a supervisor under Vance.

. See also Glenn v. Brumby, 663 F.3d 1312, 1316 (11th Cir.2011) (recognizing Price Waterhouse's gender-stereotype holding); Lewis v. Heartland Inns of Am., L.L.C., 591 F.3d 1033, 1038 (8th Cir.2010) (same); Chadwick v. WellPoint, Inc., 561 F.3d 38, 44 (1st Cir.2009) (same); Smith v. City of Salem, 378 F.3d 566, 573 (6th Cir.2004) (same); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 120 (2d Cir.2004) (same); Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 874-75 (9th Cir.2001) (same); Bibby v. Phila. Coca-Cola Bottling Co., 260 F.3d 257, 263-64 (3d Cir.2001) (same); Doe v. City of Belleville, 119 F.3d 563, 580 (7th Cir.1997), vacated, 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998) (same). Although Boh Brothers relies on the Supreme Court’s vacating of City of Belleville to argue that gender-stereotyping claims are unavailable to same-sex plaintiffs, we note that the Third Circuit reads the tea leaves exactly the opposite: "Absent an explicit statement from the Supreme Court that it is turning its back on Price Waterhouse, there is no reason to believe that the remand in City of Belleville was intended to call its gender stereotypes holding into question.” Bibby, 260 F.3d at 263 n. 5.

. It may be difficult judicially to assess whether and how harassment between two members of the same sex, neither of whom is homosexual, is "because of” the victim’s sex. But cruelty and irrationality typify harassment, prejudice, stereotyping and hostility generally, see, e.g., Oncale, 523 U.S. 75, 118 S.Ct. 998; Price Waterhouse, 490 U.S. 228, 109 S.Ct. 1775, and we echo the Supreme Court’s confidence that "[cjommon sense, and an appropriate sensitivity to social context will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff’s position would find severely hostile or abusive.” Oncale, 523 U.S. at 82, 118 S.Ct. 998.

. See, e.g., Medina v. Income Support Div., N.M., 413 F.3d 1131, 1135 (10th Cir.2005) ("These routes, however, are not exhaustive.”); Pedroza v. Cintas Corp., 397 F.3d 1063, 1068 (8th Cir.2005) (describing On-cale's list as “non-exhaustive”); Bibhy, 260 F.3d at 264 (noting the evidentiary routes stated in Oncale and stating: "[bjased on the facts of a particular case and the creativity of the parties, other ways in which to prove that harassment occurred because of sex may be available”); Shepherd v. Slater Steels Corp., 168 F.3d 998, 1009 (7th Cir.1999) (”[W]e discern nothing in the Supreme Court's [On-cale ] decision indicating that the examples it provided were meant to be exhaustive rather than instructive.”).
In addition to the above-cited circuits, we note that the Sixth Circuit acknowledged the availability of an evidentiary route not articulated in Oncale in 2006. See Vickers v. Fairfield Med. Ctr., 453 F.3d 757, 763-65 (6th Cir.2006). In a subsequent case, the Sixth Circuit noted that Oncale offered “guidance” regarding the manner in which a plaintiff can prove same-sex harassment. Wasek v. Arrow Energy Servs., Inc., 682 F.3d 463, 467-68 (6th Cir.2012). Although the court arguably treated the Oncale categories as if they were exclusive in Wasek, it did not expressly consider the issue because the plaintiff's claim fell into Oncale’s first category. Id. In any event, the Sixth Circuit follows the rule of orderliness, so Vickers, not Wasek, controls. 6th Cir. R. 206(c) ("Reported panel opinions are binding on subsequent panels.”); see Salmi v. Sec’y of Health & Human Servs., 774 F.2d 685, 689 (6th Cir.1985).

. Indeed, courts across the country have applied Price Waterhouse in cases of same-sex discrimination since Oncale. See Vickers, 453 F.3d at 763 (holding that Price Waterhouse creates a cause of action for sex discrimination based on an individual’s failure to conform to gender stereotypes, but rejecting plaintiff’s claim because he “made no argument that his appearance or mannerisms on the job were perceived as gender non-conforming in some way and provided the basis for the harassment he experienced”); Medina, 413 F.3d at 1134-35 (suggesting, in a same-sex harassment case, that a hostile environment motivated by harasser’s desire “to punish the plaintiff’s noncompliance with gender stereotypes” would be unlawful); Nichols, 256 F.3d at 874-75 (holding that a male plaintiff harassed by male co-workers because they viewed him as effeminate proved his Title VII claim); Bibby, 260 F.3d at 262-63 (ruling in a same-sex harassment case that a "plaintiff may be able to prove that same-sex harassment was discrimination because of sex by presenting evidence that the harasser’s conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender”); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261 n. 4 (1st Cir.1999) (holding that, after Oncale, the issue of whether same-sex harassment based on gender stereotyping is actionable is “no longer open”); City of Belleville, 119 F.3d at 581 ("[A] man who is harassed [by male co-workers] because ... he exhibits his masculinity in a way that does not meet his coworkers’ idea of how men are to appear and behave is harassed ‘because of his sex.' ”); see also Lewis, 591 F.3d at 1038-41; Dawson v. Bumble & Bumble, 398 F.3d 211, 218 (2d Cir.2005); Smith, 378 F.3d at 571-75.

. As the panel opinion correctly observed, there is no allegation that either Woods or Wolfe is homosexual.

. Other circuits take the same approach. See, e.g., Jones v. UPS Ground Freight, 683 F.3d 1283, 1299-1300 (11th Cir.2012) (holding that an African American man’s race-based hostile-work-environment claim could survive summary judgment although his harassers mistakenly believed he was Indian); cf. Estate of Amos ex rel. Amos v. City of Page, Ariz., 257 F.3d 1086, 1094 (9th Cir.2001) (“That Amos was actually white does not make that *457 discrimination or its resulting injury less direct. Thus, for purposes of standing, Amos should be viewed as Trustee alleges the police officers viewed him: as a Native American. The City’s alleged discrimination is no less malevolent because it was based upon an erroneous assumption.”).

. Judge Jolly’s approach — which would have the court assess a plaintiff’s "objective” status, here, that Woods was “unquestionably manly” — is inconsistent with this circuit’s longstanding precedent. See Capaci v. Katz & Besthoff, Inc., 711 F.2d 647, 660 (5th Cir.1983) (noting that Title VII would apply even if an employer advertised for a particular job only in "male wanted” columns "out of a sincere belief that females would not be interested in the job, such a belief is precisely the kind of stereotyped assumption that Title VII is aimed at eliminating”); Pond v. Braniff Airways, Inc., 500 F.2d 161, 166 (5th Cir.1974) ("[I]f the employer in any way permits stereotypical culturally-based concepts of the abilities of people to perform certain tasks because of their sex to creep into its thinking, then Title VII will come to the employee’s aid.”); see also Black, 646 F.3d at 260; WC&M Enters., 496 F.3d at 401-02.

. Of course, this does not eliminate all objective analysis in the Title VII inquiry. As discussed below, we consider the severity and pervasiveness of alleged harassment based on whether a "reasonable person in the plaintiff's position would find [it] severely hostile or abusive.” Oncale, 523 U.S. at 82, 118 S.Ct. 998. Moreover, objective evidence of a victim’s conformance, or failure to conform, to a particular stereotype may inform, but does not dictate, our analysis of a harasser’s subjective view of the victim.

.These insults lend themselves to a reasonable inference on the part of the jury that Wolfe viewed Woods as insufficiently masculine. See Nichols, 256 F.3d at 874 ("At its essence, the systematic abuse directed at Sanchez reflected a belief that Sanchez did not act as a man should act.... Sanchez's male co-workers and one of his supervisors repeatedly reminded Sanchez that he did not conform to their gender-based stereotypes, referring to him as she' and ‘her.’ And, the most vulgar name-calling directed at Sanchez was cast in female terms. We conclude that this verbal abuse was closely linked to gender.”). But, importantly, the evidence presented in this case does not depend on these insults alone. As discussed below, Wolfe engaged in several physical acts of flashing and humping at the work site, specifically and consistently aimed at Woods.

. Considering this evidence, this case is not — as Judge Jones's dissent suggests — about vulgar speech in the workplace, nor does it impose a government-compelled workplace speech code. Indeed, it appears that both Judge Jolly’s dissent and Judge Jones’s dissent operate from a different record: they either ignore this evidence, or construe it against — not in favor of — the jury verdict. The evidence here extends far beyond isolated insults and occasional horseplay. Accordingly, we must defer to the jury’s determination that it rose to the level of sexual harassment.

. The EEOC presented testimony by Dr. Liza Gold — a medical-school professor, board-certified psychiatrist, and author of a treatise on sexual harassment — regarding the nature of same-sex harassment from a psychological perspective. Boh Brothers sought to exclude Dr. Gold’s testimony in a pre-trial Daubert motion, which the district court granted in part. Specifically, the district court held that Dr. Gold could testily regarding sexual harassment studies from a psychological perspective but could not offer any opinions regarding the specific facts of the case. Boh Brothers contends that, despite this limitation, Dr. Gold's testimony served as "a means to instruct the jury on the EEOC's view of how the law of same-sex harassment should be interpreted.” As a result, Boh Brothers moved for a new trial. The district court carefully considered the issue, and ultimately denied the motion. "We will reverse the trial court’s denial of a motion for new trial only when there is a clear showing of an abuse of discretion.” Carr v. Wal-Mart Stores, Inc., 312 F.3d 667, 670 (5th Cir.2002); see Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 881 (5th Cir.2013) (citation and quotation marks omitted) ("In rulings on the admissibility of expert opinion evidence the trial court has broad discretion and its rulings must be sustained unless manifestly erroneous.”). Having carefully reviewed the record, we conclude that Dr. Gold’s limited testimony was well within the bounds of admissible evidence. Accordingly, we discern no manifest error or abuse of discretion in the district court's rulings.
Despite our deferential standard of review and the district court's careful limitation of the Dr. Gold's testimony, Judge Jones’s dissent would reverse the jury verdict on the basis that Dr. Gold's testimony may have been unhelpful and confusing to the jurors. First, it cites Federal Rule of Evidence 702, which provides that expert testimony must “help the trier of fact to understand the evidence or to determine a fact in issue.” Fed.R.Evid. 702(a). We note, however, that the helpfulness threshold is low: it is "principally ... a matter of relevance. Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful.” Roman v. W. Mfg., Inc., 691 F.3d 686, 694 (5th Cir.2012) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); see United States v. Posado, 57 F.3d 428, 433 (5th Cir.1995). Here, we cannot agree that Dr. Gold's testimony regarding the nature of same-sex harassment was so unhelpful as to have been not only inadmissible, but also reversible error.
Second, Judge Jones's dissent asserts that Dr. Gold's testimony may have conflated the "sociological” and the legal perspective of sexual harassment. But Dr. Gold’s testimony specifically and repeatedly distinguished between the two, emphasizing that "harassment in the social scientist's eyes ... may not constitute legal sexual harassment ... [and] is not limited to the legal concept of sexual harassment.” Even if Dr. Gold's testimony had some bearing on the ultimate issue, the Federal Rules of Evidence allow for such testimony. See Fed.R.Evid. 704 (indicating that, regarding expert testimony, “an opinion is *460 not objectionable just because it embraces an ultimate issue”). Moreover, the district court—present for Dr. Gold’s testimony and closest to the jurors- — heard and rejected precisely the position that Judge Jones’s dissent articulates. The district court instructed the jurors: "It is your duty to follow the law as I give it to you” and “you are not required to accept [an expert's] opinion ... it’s up to you to decide whether to reply upon it.” In denying Boh Brothers’s motion for new trial, the district court concluded: "It’s not even approaching a miscarriage of justice to allow an expert to give definitions and examples of to highlight those examples, and never did she refer to this particular case until [Boh Brothers’s] cross examination when [it] asked her about those particular areas.” Considering the district court’s thorough consideration of Dr. Gold's testimony and the high standard that applies to appellate review of motions for new trial, we decline to step into the district court’s gatekeeping shoes. In re MBS Mgmt. Servs., Inc., 690 F.3d 352, 357 (5th Cir.2012) (noting that "the trial judge serves as a gatekeeper to ensure the reliability and relevance of expert testimony” (emphasis added)); Gabriel v. City of Plano, 202 F.3d 741, 745 (5th Cir.2000) ("We reverse judgments for improper evidentiary rulings only where the challenged ruling affects a substantial right of a party. The burden of proving substantial prejudice lies with the party asserting error.” (internal quotation marks and citations omitted)).

. While a plaintiff cannot recover unless the conduct actually offended him or her, the application of a reasonable person standard prevents us from affirming damage awards to compensate overly-sensitive plaintiffs for hurt feelings. See Shepherd, 168 F.3d at 874 ("To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so.” (emphasis added) (citation omitted)).

. For this reason, the facts simply do not support the assertion made in both Judge Jolly's dissent and Judge Jones’s dissent that every man on the Boh Brothers work site could establish a Title VII claim against the company. To reach that conclusion is to ignore the evidence, as considered and found by the jury, that Wolfe specifically and consistently directed his abuse at Woods.

. Boh Brothers offered some contradictory evidence at trial. But we must draw all reasonable inferences in the light most favorable to the verdict. Westlake Petrochems., 688 F.3d at 239. Weighing the credibility of the various witnesses and their testimony is a task for the jury, not this court. Roman, 691 F.3d at 692; Ramos-Cardenas, 524 F.3d at 605.

. Judge Jolly’s dissent criticizes our purported failure to account for the fact that these actions occurred on an all-male construction site, which he contends is a customarily vulgar and crude setting. But the well-instructed jury was just as capable as we are of evaluating the social context surrounding Wolfe’s harassment. We cannot, and should not, inject our own view of the evidence at this stage of the case. Rather, we must defer to the jury verdict unless no reasonable juror could conclude that Wolfe's harassment was severe or pervasive.

. We emphasize that as employers’ anti-harassment policies become increasingly comprehensive and well-implemented, a plaintiff's success will often turn on whether he promptly reported the harassing conduct. Indeed, the Ellerth/Faragher design "works only if employees report harassment promptly, earlier instead of later, and the sooner the better.” Baldwin, 480 F.3d at 1307. As the Eighth Circuit has emphasized, "[o]nly when sexual harassment is exposed to scrutiny can it be eliminated; thus it makes sense to encourage victims of sexual harassment to come forward because ... they are often the only ones, besides the perpetrators, who are aware of sexual harassment.” Adams v. O’Reilly Auto., Inc., 538 F.3d 926, 933 (8th Cir.2008). Thus, where an employer implements suitable institutional policies and educational programs regarding sexual harassment, an employee who fails to take advantage of those policies cannot recover. Pinkerton v. Colo. Dep’t of Transp., 563 F.3d 1052, 1063 (10th Cir.2009) (“It is undeniable that raising problems regarding sexual harassment can be uncomfortable for the employee, but if we were to allow an employee's subjective, ungrounded fears of unpleasantness or retaliation to alleviate an employee’s reporting requirement, we would 'completely undermine Title VII’s basic policy of encouraging forethought by employers and saving action by objecting employees.' " (quoting Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 268 (4th Cir.2001))).

. Boh Brothers’s generic policies are distinguishable from those we have held sufficient to satisfy the Ellerth/Faragher standard. See, e.g., Lauderdale, 512 F.3d at 164 ("The TDCJ has satisfied the requirements of the first prong by virtue of its institutional policies and educational programs regarding sexual harassment. It is undisputed that Lauderdale received the requisite training and copies of the TDCJ’s sexual-harassment policy statements. There is no allegation that the TDCJ's program, designed to avoid, report, and correct instances of sexual harassment, is insufficient or unreasonable.”); Hockman, 407 F.3d at 329 (“Hockman received the Westward employee handbook containing the company’s antiharrassment policy,” which provided that “if the employee does not feel that her allegation is being handled satisfactorily by his or her supervisor, then she should report the *464 incident directly to the Director of Human Resources”); Wyatt, 297 F.3d at 410 ("In concluding that Hunt satisfied the first prong, the court recited the undisputed facts that Hunt maintained a sexual harassment policy which it promulgated to all employees, including Wyatt, and that she knew that the policy instructed employees to report harassing incidents and to whom the report should be made. In addition, Hunt held regular meetings with its supervisory staff to train them on preventing sexual harassment.”); Casiano v. AT&T Corp., 213 F.3d 278, 286 (5th Cir.2000) ("The summary judgment evidence adduced by AT & T regarding its extant procedures for encouraging and facilitating employee complaints of sexual harassment and for thereafter dealing with them swiftly and effectively is essentially uncontroverted and eschews the existence of a genuine dispute of material fact in that regard. AT & T’s Personnel Guide, Employee Reference Guide, and 'Common Bond’ all articulate the company policy that forbids sexual harassment and encourages both those who believe they are being harassed and those who witness harassment to notify supervisors as well as the ‘applicable’ AT & TEO/AA representative.”).

. Surely an employee cannot defeat the El-lerth/Faragher affirmative defense by choosing to ignore his employer's well-communicated policies. But here, there is record evidence that Boh Brothers did not relay its nondiscrimination policies in an effective manner.

. We have considered the existence of a written complaint procedure to be an important variable in the Ellerth/Faragher analysis. See Walker, 214 F.3d at 627 (noting that an employer’s lack of a written complaint procedure weighed against granting the employer's motion for summary judgment); cf. Harper v. City of Jackson Mun. Sch. Dist., 149 Fed.Appx. 295, 300 (5th Cir.2005) (unpublished but persuasive) (affirming summary judgment where an employee failed to avail herself of a complaint procedure that specifically provided that “an employee may bypass a harassing supervisor and complain about sexual harassment to the District’s Title IX coordinator”); Moayedi v. Compaq Computer Corp., 98 Fed.Appx. 335, 338 (5th Cir.2004) (unpublished but persuasive) (affirming summary judgment where an employee failed to reasonably avail herself of workplace harassment policies that she knew were in effect "because she had previously utilized them to stop a former harassing co-employee”).

. Boh Brothers, a company of about 1,500 employees, had no human-resources department. Lipiani, the company's general counsel and designated EEO officer, conducted the five-minute sexual harassment training. At trial, Lipiani downplayed his knowledge of sexual harassment law. When asked, “[s]o you are the company’s top in-house expert about sexual harassment, correct?” he responded, “I don't know if I’m the expert.”

. It is worth noting that the three Oncale evidentiary routes — two of which have nothing to do with sexual desire — were recognized about eight years before the events in the instant matter came to pass. See Oncale, 523 U.S. at 80-81, 118 S.Ct. 998.

. Although investigation is most easily seen as bearing upon the "prompt correction” aspect of Ellerth/Faragher ’s first prong, it ultimately becomes a "prevention” measure as well. That is, prompt and thorough investigation serves as a deterrent to potential violators, and investigative findings may inform the employer’s anti-harassment training program in an iterative improvement process. Here, the company’s investigation pales in comparison to the prompt and effective responses we have noted in other cases. See Williams v. Admin. Review Bd., 376 F.3d 471, 479 (5th Cir.2004) ("Furthermore, once Pan-tex Management was informed of the hostile environment in March 1996 it acted swiftly to address the situation. Specifically, Pantex Management promptly assembled an investigative team to look into the alleged hostilities and offered recommendations on how the problem might be solved. After the investigative team completed its report, Pantex Management shut down the W55 program and required the entire staff to complete forty hours of training in effective human interaction and teamwork. In addition, the company conducted a line-by-line group-review of the program's safety procedures in order to ease tensions among employees. After the W55 program was restarted, Pantex ordered a follow-up investigation into the hostilities and found that hostilities had reduced significantly. Finally, Pantex Management ordered a root-causes analysis be performed, which resulted in the publication of written guidelines for supervisors on avoiding future hostility.” (citations omitted)); Moayedi, 98 Fed.Appx. at 338 ("We further agree with the district court’s conclusion that Compaq acted reasonably and quickly in investigating the situation and fired Tumlinson within three weeks after the harassment was reported.”); Casiano, 213 F.3d at 286 ("AT & T responded promptly and effectively: It suspended Valenzuela, the accused harasser, and dispatched two of its E.O. Specialists to conduct an in-depth investigation involving, among other things, interviews with Casiano, Valenzuela, and nine other workers.”).

.Duckworth ultimately transferred Woods (not Wolfe) away from the job site, and he did so only after Woods called Carpenter seeking his job back.

. This requirement serves Title VII's purpose of encouraging "employees to report harassing conduct before it becomes severe or pervasive.” Ellerth, 524 U.S. at 764, 118 S.Ct. 2257; see Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1307 (11th Cir.2007) ("The genius of the Faragher-Ellerth plan is that the corresponding duties it places on employers and employees are designed to stop sexual harassment before it reaches the severe or pervasive stage amounting to discrimination in violation of Title VIL”).

. While the Ellerth/Faragher affirmative defense offers meaningful protection to well-intentioned defendants who take preventative and corrective measures to address harassment in the workplace — it is not the only safety valve for defendants facing Title VII claims. Regardless of the existence of an internal complaint, Title VII itself requires an employee to file an EEOC claim in a timely and specific manner. For example, a plaintiff must file a complaint with the EEOC within 180 days of the alleged discriminatory act (or *467 within 300 days if the plaintiff has initially instituted proceedings with a state or local agency with authority to grant relief). 42 U.S.C. § 2000e-5(e)(l). In addition, a Title VII plaintiff must exhaust all administrative remedies. Tolbert v. United States, 916 F.2d 245, 247 (5th Cir.1990). "Ordinarily, an employee may not base a Title VII claim on an action that was not previously asserted in a formal charge of discrimination to the EEOC, or that could not 'reasonably be expected to grow out of the charge of discrimination.’ " Filer v. Donley, 690 F.3d 643, 647 (5th Cir.2012) (quoting Pacheco v. Mineta, 448 F.3d 783, 795 (5th Cir.2006)).

. For example, several courts have held that a plaintiff is entitled to compensatory, but not punitive, damages, even where supervisors knew of discriminatory conduct and failed to afford employees a clear path to report the discrimination. See, e.g., Sturgill v. United Parcel Serv., Inc., 512 F.3d 1024, 1035 (8th Cir.2008) (finding punitive damages inappropriate where the evidence showed no individual or corporate malice or reckless indifference to the company’s Title VII obligations); Splunge v. Shoney’s, Inc., 97 F.3d 488, 490-91 (11th Cir.1996) (denying punitive damages where higher management had constructive knowledge of discriminatory conduct); Walters v. City of Atlanta, 803 F.2d 1135, 1147 (11th Cir.1986) (finding no evidence in the record to suggest reckless disregard for plaintiff’s rights where plaintiff was treated courteously, but discriminated against, in his endeavor to obtain a directorship position); Soderbeck v. Burnett Cnty., 752 F.2d 285, 290 (7th Cir.1985) (finding punitive damages to be improper on the basis of discharge to make a supervisor’s life easier, despite evidence in the record of discrimination stemming from political differences); see also Dudley v. Wal-Mart Stores, Inc., 166 F.3d 1317, 1323 (11th Cir.1999) (emphasizing that punitive damages are "to punish those who have actually done wrong and not those who have liability by implication of law only”).

. Whether an employer acts in “good faith” is a distinct inquiry from whether an employer established the Ellerth/Faragher affirmative defense. See Harris v. L & L Wings, Inc., 132 F.3d 978, 983 (4th Cir.1997) (illustrating that, in some cases, the existence of a written policy against discrimination “operates] as a total bar to employer liability for punitive damages”); see also Scrivner v. Socorro Indep. Sch. Dist., 169 F.3d 969, 971-72 (5th Cir.1999) (finding bad faith where a teacher thwarted the purposes of Title VII by misleading investigators). Put differently, a policy adopted in good faith can be unreasonable or unsuitable to the circumstances, such that the defendant can satisfy the Kolstad good faith inquiry, but not prong one of the Ellerth/Far-agher defense.

. See Jeffries v. Wal-Mart Stores, Inc., 15 Fed.Appx. 252, 269 (6th Cir.2001) (unpublished but persuasive) (“Plaintiff has provided no evidence that Defendant's employees knew of the federal prohibition against retaliation, or the state prohibitions for that matter, and none of the actions taken by Defendant's employees could lead a reasonable juror to infer 'evil intent.’ ").

. The jury awarded $1,000 in back pay and $200,000 in mental anguish damages.

. Specifically, 42 U.S.C. § 1981 a(b)(3)(D) caps the sum of "the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses” and the "amount of punitive damages awarded under this section” at $300,000 for companies with “more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year.”

. Boh Brothers disputed the EEOC’s interpretation of Abner at the post-trial conference. After the district court issued its judgment in this case, we affirmed a district court’s use of its discretion to grant a remittitur of a Title VII punitive damages award that fell below the statutory cap. EEOC v. Serv. Temps Inc., 679 F.3d 323, 337-38 (5th Cir.2012).

. Judge DeMoss’s dissent emphasizes that the EEOC did not challenge the reduction of its compensatory damages award on appeal. But, of course, the EEOC could not appeal the issue. It is “more than well-settled that a party cannot appeal from a judgment unless ‘aggrieved’ by it.” In Re Sims, 994 F.2d 210, 214 (5th Cir.1993) (citation omitted). "Simply stated, a party who has obtained a judgment in his favor, granting the relief sought, is not aggrieved by it.” Id. (emphasis added). Indeed, we have emphasized that a "cross-appeal filed for the sole purpose of advancing additional arguments in support of a judgment is worse than unnecessary, because it disrupts the briefing schedule, increases the number (and usually the length) of briefs, and tends to confuse the issues.” Id. (citation and internal quotation marks omitted).
Here, the district court’s judgment awarded the EEOC all of the relief allowable under the statute; accordingly, it had no grounds to appeal the manner in which the court reached the $300,000 figure. See, e.g., Lindheimer v. Ill. Bell Tel. Co., 292 U.S. 151, 176, 54 S.Ct. 658, 78 L.Ed. 1182 (1934) (dismissing appeal of prevailing party); Ward v. Santa Fe Indep. Sch. Dist., 393 F.3d 599, 603 (5th Cir.2004) (finding that the plaintiffs lacked standing because they "received all of the relief they requested and cannot demonstrate any adverse effect resulting from the judgment”); Fountain v. Bd. of Trs. of Biloxi Mun. Separate Sch. Dist., 226 F.3d 643 (5th Cir.2000) (per curiam) ("Only the party aggrieved has standing to appeal.”). Because our decision upsets the EEOC’s total damages award, the EEOC is now in a different position. We think it best to remand and allow both parties to fully brief and argue whether the evidence is sufficient to support the jury’s compensatory damages award.