IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 21, 2007

No. 06-41636

Charles R. Fulbruge III
Clerk

DEBRA LAUDERDALE,

                                        Plaintiff-Appellant,

v.

TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION;
RODRICK D. ARTHUR,

                                        Defendants-Appellees.

---

Appeals from the United States District Court
for the Eastern District of Texas

---

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Debra Lauderdale alleges she was sexually harassed by her ultimate supervisor, Rodrick Arthur, over the period of almost four months during which she worked as a correctional officer for the Texas Department of Criminal Justice ("TDCJ"). Lauderdale sued the TDCJ under title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and sued Arthur under 42 U.S.C. § 1983. The district

court granted summary judgment for both defendants.  We affirm in part, reverse in part, and remand.

I.

Lauderdale began her employment with the TDCJ on June 3, 2004.  After five weeks of TDCJ academy training, she was assigned as a correctional officer to the Coffield Unit.  Her first two weeks consisted of on-the-job training in various areas of the unit, during which time she met Arthur.  Upon completion of Lauderdale's training, Arthur, as acting warden on the night shift, became her ultimate supervisor.

In late July, shortly after Lauderdale completed her on-the-job training, Arthur began to pursue a relationship with her.  According to Lauderdale, Arthur would call her multiple times at her duty station during the night shift.  During one of the first phone conversations, he asked her to get coffee with him after the shift ended.  After this first evening of phone calls, Lauderdale told Sergeant Kroll, her immediate supervisor, that Arthur had been telephoning her.  Kroll told Lauderdale she could speak to the warden about the calls but that she should not mention Kroll's name.

The calls and requests to go out after the night shift continued and, though they varied in frequency, eventually reached an average of ten to fifteen calls during a shift.  During one call, Arthur asked Lauderdale whether she was married; she lied and told him she was, to which Arthur responded that his heart was broken and he might hang himself.  At other times, Arthur told Lauderdale she was beautiful and that he loved her.

On another occasion, Arthur called Lauderdale and, during the course of the discussion, asked her what she enjoyed doing.  She told him she enjoyed gambling.  Arthur suggested that the two of them could go to Las Vegas and "snuggle;" Lauderdale said "No."  Other topics of conversation during the phone

calls included Arthur's family and horses. On one occasion, he called and Lauderdale explained that she was upset that, for some reason, she was not going to rotate according to the schedule.

In August, after Lauderdale began working in another building at the unit, Arthur called and told her he missed her, then showed up at the building in which she was working. He would also invite her to sit with him in the warden's office during her breaks; she refused those invitations. After a break one evening in mid-October, as she returned to her duty station, Lauderdale passed Arthur in the hall by the "searcher's desk." Arthur grabbed her handcuff case, which she wore in the middle of her back on her belt, and pulled her to himself. Her lower back touched his stomach before she jerked away from him.

Finally, on October 25, Arthur sent for Lauderdale, presumably ordering her to report to him. She believed he had no legitimate reason to see her, and she refused to report to him. After this incident, she did not return to work. Before her next shift she telephoned a supervisor and indicated she would not be at work that day; she did not, however, indicate that she no longer intended to work for the TDCJ. After receiving a letter from Human Resources indicating that she would not receive her last pay check until she turned in her uniforms, Lauderdale returned to the unit on December 3 and officially resigned and indicated "Dissatisfaction with supervisors or coworkers" as the reason. She then spoke with Assistant Warden Sizemore and filed a formal EEO complaint against Arthur for sexual harassment.

The TDCJ investigated Lauderdale's allegations and found sufficient evidence to deem Arthur guilty of "Discourteous Conduct of a Sexual Nature." This determination resulted in a four-day suspension without pay and a nine-month probation. Arthur ultimately resigned at some point following the investigation.

Lauderdale does not allege that any adverse employment actions were taken against her; she concedes that she was able to perform her duties fully de-

spite Arthur's harassment. She also acknowledges she received and read a copy of the various policies covering sexual harassment and watched a training video on the subject. Save for her discussion with Kroll in late July, Lauderdale admits that she never complained to anyone else who was in her chain of command or was identified in the TDCJ sexual harassment policy. She contends that she did not complain to anyone other than Kroll because she feared retaliation.

## II.

"This Court reviews grants of summary judgment de novo, applying the same standard as does a district court, viewing the evidence in a light most favorable to the non-movant." Fruge ex rel. Fruge v. Parker Drilling Co., 337 F.3d 558, 560 (5th Cir. 2003) (citations omitted). We apply that standard of review now.

## A.

The district court granted the TDCJ's motion for summary judgment because it held that, as a matter of law, Arthur's behavior was neither severe nor pervasive and, therefore, did not create a hostile work environment. We disagree.

Under title VII, it is illegal "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This text prohibits sexual harassment that takes the form of a tangible employment action, such as a demotion or denial of promotion, or the creation of a hostile or abusive working environment. Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (citing Harris v. Forklift Sys., 510 U.S. 17, 21 (1993); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). Here, there is no allegation of a tangible

employment action.

The only issue is whether Arthur's behavior created a hostile or abusive working environment. Where the claim of harassment is against a supervisor, there are four elements of a hostile working environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a "term, condition, or privilege" of employment. Watts v. Kroger Co., 170 F.3d 505, 509 (5th Cir. 1999).

As a woman, Lauderdale satisfies the first element; the second and third elements are satisfied by the TDCJ's finding that Arthur had engaged in "Discourteous Conduct of a Sexual Nature." To satisfy the fourth element, however, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor, 477 U.S. at 67 (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)). The environment must be deemed "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris, 510 U.S. at 21-22).

In determining whether an environment is hostile or abusive, the court must look to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; . . . whether it unreasonably interferes with an employee's work performance," Harris, 510 U.S. at 23, and "whether the complained of conduct undermined the plaintiff's workplace competence," Butler v. Ysleta Indep. Sch. Dist., 161 F.3d 263, 270 (5th Cir. 1998). Title VII, however, is not a "'general civility code,'" and "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 524 U.S. at 788

(citations omitted).

Although the district court correctly noted that none of the incidents of alleged harassment rises to the level of severity we have required,[1] the testSS whether the harassment is severe or pervasiveSSis stated in the disjunctive. An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment. Harvill v. Westward Commc'ns, LLC, 433 F.3d 428, 434-35 (5th Cir. 2005). The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of "pervasive," thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists. Thus, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." El-lison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991).

Viewing Lauderdale's allegations in the most favorable light, as we must, Arthur's behavior was pervasive. Lauderdale alleges that he called her ten to fifteen times a night for almost four months. Though Lauderdale does not assert that each phone call carried sexual overtones, the frequency of unwanted atten-tion, over a four-month time period, amounts to pervasive harassment. Given this pervasiveness, the level of severity necessary to establish an altered work environment is diminished and Arthur's invitation to Lauderdale to "snuggle" in Las Vegas, the physical act of pulling her to himself, and the repeated re-

---

[1] See, e.g., Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 328 (5th Cir. 2004) (holding that comments to plaintiff about another employee's body, slapping plaintiff on the behind with a newspaper, grabbing or brushing up against plaintiff's breasts and behind, and attempting to kiss plaintiff were not severe as a matter of law); Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 871-75 (5th Cir. 1999) (holding that several inappropriate com-ments, including "your elbows are the same color as your nipples," and touchings, including rubbing plaintiff's arm from shoulder to wrist, were not severe); Weiss v. Coca-Cola Bottling Co., 990 F.2d 333, 337 (7th Cir. 1993) (holding that conduct, including asking plaintiff out on dates, placing "I love you" signs in her work area, and attempting to kiss her three times did not constitute severe or pervasive harassment).

quests to get coffee after work all satisfy the requirement. Thus, Lauderdale has a viable hostile work environment claim under title VII.

B.

Because there is a genuine issue of material fact regarding the creation of a hostile work environment, we must consider the TDCJ's assertion of the Ellerth/Faragher affirmative defense. In Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998), and Faragher, 524 U.S. at 807, the Court recognized one affirmative defense that employers may raise against a title VII claim alleging a hostile work environment created by a supervisor's sexual harassment. So long as the supervisor's actions did not result in a "tangible employment action" against the employee, Faragher, 524 U.S. at 807, employers may assert the Ellerth/Faragher defense, which requires the employer to prove by a preponderance of the evidence "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id.

It is undisputed that no tangible employment action resulted from Arthur's behavior; Lauderdale was never demoted, reassigned, or had her hours changed because of his actions. Thus, the TDCJ is entitled to raise the Ellerth/-Faragher defense. The TDCJ has satisfied the requirements of the first prong by virtue of its institutional policies and educational programs regarding sexual harassment. It is undisputed that Lauderdale received the requisite training and copies of the TDCJ's sexual-harassment policy statements. There is no allegation that the TDCJ's program, designed to avoid, report, and correct instances of sexual harassment, is insufficient or unreasonable.

The contested issue is whether the second prong of the affirmative defense is satisfied. Lauderdale claims the Ellerth/Faragher defense is unavailable to

the TDCJ because she took advantage of the TDCJ's sexual-harassment prevention and remediation policies by reporting Arthur's harassment to Kroll, her immediate supervisor, as dictated by TDCJ policy. The TDCJ's policy offers numerous avenues for reporting sexual harassment, including any supervisor, the Employee Relations Office of the Human Resources Department, the TDCJ Executive Director, the United States Equal Employment Opportunity Commission, and the Texas Commission on Human Rights. It was therefore unreasonable for Lauderdale not to pursue any other avenue available under the TDCJ policy after Kroll explicitly indicated his unwillingness to act on her complaint.

We have confronted a similar circumstance before. In Wyatt v. Hunt Plywood Co., 297 F.3d 405, 412 (5th Cir. 2002), the plaintiff reported her supervisor's harassment to his supervisor, who dealt ineffectively with the harassment and subsequently began harassing the plaintiff himself. We held that it was unreasonable for the plaintiff not to report the harassment to another person listed in the defendant's reporting policy once her initial complaint was obviously ineffective. Id. at 413. Thus, Wyatt counsels that Lauderdale's failure to use one of the other reporting avenues provided by the TDCJ was unreasonable.

In most cases, as here, once an employee knows his initial complaint is ineffective, it is unreasonable for him not to file a second complaint, so long as the employer has provided multiple avenues for such a complaint. This conclusion is consistent with title VII's intent to encourage "saving action by objecting employees." Faragher, 524 U.S. at 807. Although it is conceivable that under certain circumstances an employee's failure to file a subsequent complaint would not be unreasonable, even where there are multiple reporting avenues, Lauderdale's circumstances do not render her failure reasonable.

Likewise, Lauderdale's formal complaint on December 3, 2004, the date of her resignation, does not defeat the second prong of the Ellerth/Faragher defense. Filing a complaint upon, or after, resigning does not mitigate any of the

damage, because it does not allow the employer to remediate the situation. A complaint filed at such a late date is no longer a saving action contemplated and encouraged by title VII, Faragher, 524 U.S. at 807, hence it is not sufficient to defeat the Ellerth/Faragher affirmative defense. "[I]f damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided." Id. Thus, Lauderdale's complaint, filed on the day she resigned, does not defeat the affirmative defense.

Furthermore, the TDCJ conducted an investigation after Lauderdale formally complained. That investigation resulted in disciplinary action against Arthur. The TDCJ's prompt remedial action upon receiving Lauderdale's complaint confirms that the first prong of the Ellerth/Faragher defense has been satisfied and that Lauderdale could have mitigated the harm had she tried to make a second complaint after Kroll had refused to intervene.

In light of the TDCJ's standing policies on sexual harassment, its training program, and its prompt action following Lauderdale's formal complaint, the TDCJ has satisfied the first prong of the Ellerth/Faragher defense. Lauderdale's failure to complain after her initial conversation with Kroll is a failure to take advantage of the TDCJ's prevention program, thereby satisfying the second prong. Thus, the TDCJ avoids vicarious liability.

III.

A.

The district court, having concluded that Arthur's behavior, as alleged by Lauderdale, was not sufficiently severe or pervasive to satisfy the requirements of title VII, also decided that Arthur's behavior did not create a viable § 1983 claim. That is error.

To state a viable claim under § 1983, "a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) dem-

onstrate that the alleged deprivation was committed by a person acting under color of state law." Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 525 (5th Cir. 1994). It is undisputed that Arthur acted under color of state law, and "sexual harassment in public employment violate[s] the Equal Protection Clause of the Fourteenth Amendment" and is therefore actionable under § 1983. Southard v. Tex. Bd. of Criminal Justice, 114 F.3d 539, 550 (5th Cir. 1997). Thus, the initial question here, as under title VII, is whether Arthur's behavior amounts to actionable sexual harassment.

Section 1983 and title VII are "parallel causes of action." Cervantez v. Bexar County Civil Serv. Comm'n, 99 F.3d 730, 734 (5th Cir. 1996). Accordingly, the "inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII." Wallace v. Tex. Tech Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (citing Briggs v. Anderson, 796 F.2d 1009, 1019-21 (8th Cir. 1986)). As demonstrated above, title VII requires that actionable harassment be severe or pervasive. We apply the same standard under § 1983 and reach the same conclusion. Because Arthur's behavior, as alleged, was pervasive, it creates an actionable § 1983 claim about which there is a genuine issue of material fact, so summary judgment is not appropriate.

## B.

Arthur avers that, in the event we conclude, as we have, that his alleged behavior does constitute sexual harassment, he is nonetheless entitled to qualified immunity. The district court, though it did not need to reach the issue, agreed that Arthur was entitled to qualified immunity. Again we disagree.

The qualified immunity analysis requires us first to determine "whether the plaintiff['s] allegations, if true, establish a violation of a clearly established right." Wallace v. County of Comal, 400 F.3d 284, 289 (5th Cir. 2005) (citing Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998) (en banc)). Next, "if

the plaintiff[] ha[s] alleged a violation, the court must decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident." Id.

Answering the first question in the qualified immunity analysis is easy in this case. The right to be free of sexual harassment that creates a hostile work environment is clearly established and has been since the Court decided Meritor in 1986. See Meritor, 524 U.S. at 66. Answering the second question in the qualified immunity analysis is only slightly more complicated. Although no one thinks that sexual harassment is objectively reasonable, the question is whether a reasonable person would have thought Arthur's specific acts constituted sexual harassment; that brings us back to the original question whether his behavior amounted to sexual harassment under title VII or § 1983.

Given that actionable sexual harassment under title VII must be "objectively . . . offensive," Faragher, 524 U.S. at 787 (citing Harris, 510 U.S. at 21-22), such behavior cannot be "objectively reasonable" for purposes of the qualified immunity inquiry. Thus, qualified immunity can never offer protection for sexual harassment because, if it is actionable at all, the harassment is by definition objectively offensive and unreasonable, and qualified immunity protects only the "objectively reasonable," County of Comal, 400 F.3d at 289 (citing Hare, 135 F.3d at 325). Because we have already determined that Arthur's alleged behavior is actionable under title VII and § 1983, we have necessarily determined that such behavior was objectively offensive and, therefore, not objectively reasonable. Thus, he is not entitled to qualified immunity.

IV.

Lauderdale claims constructive discharge. To prove that, a "'plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign.'" Brown v. Kinney Shoe Co., 237 F.3d 556, 566

(5th Cir. 2001) (quoting Faruki v. Parsons, 123 F.3d 315, 319 (5th Cir. 1997)). The following events are relevant evidence that a reasonable employee would feel compelled to resign:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000) (internal citations omitted).

A plaintiff is not required to demonstrate that the employer specifically intended to force his resignation, Haley v. Alliance Compressor, 391 F.3d 644, 650 (2004) (citation omitted), but "[c]onstructive discharge requires a greater degree of harassment than that required by a hostile environment claim," Kinney Shoe, 237 F.3d at 566. Lauderdale has presented no evidence of demotion, reduction in salary or responsibilities, reassignment, or altered terms of employment. She has offered evidence only of harassment, and there is no evidence that the harassment was calculated to encourage her resignation, nor is there evidence of any aggravating factors, such as an employer's "invidious intent to create or perpetuate the intolerable conditions compelling resignation." Haley, 391 F.3d at 650 (citation omitted).

Lauderdale has merely reiterated the facts that constituted harassment and has failed to mention constructive discharge except in the summary-of-the-argument section of her brief. Thus, she has offered no additional facts that might establish the "greater degree of harassment" necessary for constructive discharge. Her failure to brief and correctly to distinguish constructive discharge from her harassment claim means she has failed to create a genuine issue of material fact that a reasonable employee would have felt compelled to re-

sign under the same circumstances.

V.

In summary, because the TDCJ has successfully asserted the Ellerth/Faragher defense, the summary judgment in favor of the TDCJ is AFFIRMED. The denial of the constructive discharge claim against the TDCJ is also AFFIRMED. The summary judgment as to the § 1983 claim against Arthur and Arthur's qualified immunity defense is REVERSED. This matter is REMANDED for further proceedings as required.