**Opinion issued March 6, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00469-CV

———————————

## TEXAS DEPARTMENT OF AGING AND DISABILITY SERVICES,
### Appellant

### V.

### ESTHER IREDIA, Appellee

---

### On Appeal from the 434th District Court
### Fort Bend County, Texas
### Trial Court Case No. 11-DCV-189589

---

## MEMORANDUM OPINION

The Texas Department of Aging and Disability Services ("DADS") brings this interlocutory appeal to challenge the trial court's denial of its plea to the jurisdiction on the employment discrimination claims brought by appellee Esther

Iredia under Chapter 21 of the Labor Code.[1] In two issues, DADS contends that the trial court's denial of the plea was error because Iredia failed to present a prima facie case of (1) gender discrimination and (2) race/national origin discrimination. We affirm in part and reverse in part.

## Background

Iredia was hired by DADS in 2000 as a member of the direct care staff at the Richmond State Supported Living Care Center.[2] Several months after she began work, she was promoted to the position of Qualified Mental Retardation Professional ("QMRP"). Among her responsibilities was the development of progress plans for the individuals served by the center. In 2007, Kenny Sowemimo became Iredia's supervisor and, in 2010, he terminated Iredia's employment for allegedly falsifying reports.

On May 2, 2011, Iredia filed suit against DADS alleging sexual harassment and both racial discrimination and discrimination based upon her national origin. In her deposition testimony, Iredia addressed the following incidents involving Sowemimo:

---

[1] TEX. LAB. CODE ANN. § 21.051 (West 2006).

[2] The Center provides twenty-four hour campus-based direct services and support to individuals with intellectual and developmental disabilities in a thirteen-county area. *See* http://www.dads.state.tx.us/services/SSLC/richmond.html.

2

- 2008—Iredia approached Sowemimo to speak to him about a patient transfer, and he said, "[y]ou skinny skeleton.  You don't eat.  You know, don't want you to die here," and told her to get out of his face;

- Sowemimo told another employee, in Iredia's presence, that he hated Nigerian women; when Iredia asked how he could hate Nigerian women when he had been born and raised in Nigeria and his mother and sister are Nigerian, he responded that his mother was dead and that he did not speak to his sister;

- 2009—Iredia introduced her son to Sowemimo, who asked Iredia "[d]id you eat today?  You so skinny.  How can this be your son?", and asked Iredia's son, "[i]s this your mom?  Is this your mother?"

- When Iredia told Sowemimo that she needed to leave early to pick up a male friend from the airport, Sowemimo responded that no man would want a "skinny bone" like her, except for white people who eat leaves because they do not want to gain weight, and "that's why her husband left her";

- Whenever Sowemimo visited Iredia's office, he typically kicked the door open;

- When Sowemimo saw Iredia taking pizza to her office, he said she was taking it to her children because "they don't have food to eat";

- "There is no day . . . that I go to work or Kenny is there that Kenny will not call me names."

- In the presence of Iredia and her co-workers, Sowemimo said he did not like skinny women but that he liked "fat women,"; he described "when he's on top of a skinny wom[a]n to the extent he use[] his hand like this (indicating) on his, you know, groin area, that that hurts him when he's . . . lying on top of a skinny woman"; and

- Sowemimo constantly told Iredia that he was going to fire her before she was terminated.

In addition to these incidents, Iredia claimed that on another occasion, one of the nurses pulled Iredia's pants leg up to show visiting nursing students how skinny she was. She also testified that Sowemimo's treatment of other QMRPs was more favorable than his treatment of her, noting that they were allowed to represent the unit in his absence despite Iredia's seniority.

On April 26, 2013, DADS filed an answer and a plea to the jurisdiction. Following a hearing on May 20, 2013, the trial court signed an order denying the plea[3] and DADS timely prosecuted this interlocutory appeal.[4]

## Discussion

In its first and second issues, DADS contends that the trial court erred in denying its plea to the jurisdiction because Iredia failed to present a prima facie case to support her sexual harassment and racial/national origin discrimination claims. Iredia contends that the trial court properly denied DADS's plea because she presented sufficient evidence to create a fact issue regarding jurisdiction.

---

[3] The record before us contains no reporter's record of the May 20, 2013 hearing.

[4] DADS brings this interlocutory appeal pursuant to Texas Practice and Remedies Code section 51.014(a)(8), which permits a governmental unit to appeal a district court's order denying its plea to the jurisdiction. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (West 2012).

4

## A. Plea to the Jurisdiction

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). The plaintiff has the burden to allege facts that affirmatively demonstrate that the trial court has subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). A plea to the jurisdiction can be utilized to challenge whether the plaintiff has met his burden of alleging jurisdictional facts, but it can also raise a challenge to the existence of jurisdictional facts. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). Pleadings are construed liberally in favor of the pleader, and all factual allegations are accepted as true. *See id.* at 228.

A trial court's review of a plea to the jurisdiction challenging the existence of jurisdictional facts mirrors that of a traditional motion for summary judgment. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012); *Miranda*, 133 S.W.3d at 228; *see* TEX. R. CIV. P. 166a(c). The government defendant is required to meet the summary judgment standard of proof for its assertion that the trial court lacks jurisdiction; once the defendant meets its burden, the plaintiff is then required to show that there is a disputed material fact regarding the jurisdictional issue. *Miranda*, 133 S.W.3d at 228. If the evidence creates a fact question regarding jurisdiction, the trial court must deny the plea to the jurisdiction

5

and leave its resolution to the fact finder. *Id.* at 227–28. On the other hand, if the evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Garcia*, 372 S.W.3d at 635. An appellate court reviewing a challenge to a trial court's subject matter jurisdiction reviews the trial court's ruling de novo. *Miranda*, 133 S.W.3d at 228.

**B. Sovereign Immunity and Chapter 21 of the Labor Code**

Sovereign immunity deprives a trial court of jurisdiction over suits in which the state or certain governmental units have been sued unless the state consents to suit. *Garcia*, 372 S.W.3d at 636. The Legislature has provided a limited waiver of sovereign immunity for those employment discrimination and retaliation claims falling within Chapter 21 of the Texas Labor Code. *See* TEX. LAB. CODE ANN. §§ 21.051(1), 21.055 (West 2006) (prohibiting unlawful employment practices by "employer"); § 21.002(8)(D) (defining "employer" to include a county, municipality, state agency, or state instrumentality). While a plaintiff must plead the elements of her statutory cause of action—in this case, the basic facts that make up the prima facie case—so that the court can determine whether she has sufficiently alleged a violation under Chapter 21, the plaintiff will only be required to submit evidence if the defendant presents evidence negating one of those basic facts. *Garcia*, 372 S.W.3d at 637 (citing *Miranda*, 133 S.W.3d at 228).

6

Texas courts look to federal interpretation of analogous federal statutes for guidance because an express purpose of Chapter 21 is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments." TEX. LAB. CODE ANN. § 21.001(1) (West 2006); *see also NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999). Under the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S. Ct. 1817, 1824–26 (1973), the plaintiff must first establish a prima facie case of discrimination or retaliation. *Id.* at 802, 93 S. Ct. at 1824. Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094 (1981). If the plaintiff is successful, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 477 (Tex. 2001). "The offer of a legitimate reason eliminates the presumption of discrimination created by the plaintiff's prima facie showing." *Id.* The burden then shifts back to the plaintiff to show that the employer's reason was a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 807, 93 S. Ct. at 1826–27. Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier-of-fact that the defendant

7

intentionally discriminated against the plaintiff remains at all times with the plaintiff. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000).

## C. Hostile Environment Sexual Harassment

### 1. Applicable Law

Chapter 21 of the Labor Code provides that it is unlawful for an employer to discriminate against an employee with respect to compensation or the terms, conditions, or privileges of employment because of race, color, disability, religion, sex, national origin, or age. TEX. LAB. CODE ANN. § 21.051 (West 2006). Sexual harassment is a form of prohibited sex discrimination. *Green v. Indus. Specialty Contractors, Inc.*, 1 S.W.3d 126, 131 (Tex. App.—Houston [1st Dist.] 1999, no pet.); *Soto v. El Paso Natural Gas Co.*, 942 S.W.2d 671, 677 (Tex. App.—El Paso 1997, pet. denied). Courts have generally categorized sexual harassment claims as either "quid pro quo" or "hostile work environment." *Soto*, 942 S.W.2d at 677–78.

Here, it is undisputed that this case presents allegations of sexual harassment based on a hostile work environment. To prevail on a claim involving a hostile work environment, a plaintiff must show that (1) she was an employee who belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term,

8

condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take adequate remedial action. *Gulf States Toyota, Inc. v. Morgan*, 89 S.W.3d 766, 770 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *McMillon v. Tex. Dep't of Ins.*, 963 S.W.2d 935, 939 (Tex. App.— Austin 1998, no pet.). However, if the alleged harassment was perpetrated by a supervisor with immediate or successively higher authority over the harassed employee—as is the case here—the employee need only satisfy the first four elements of the test outlined above. *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).

To satisfy the fourth element of a hostile environment sexual harassment claim, a plaintiff must show that the workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to create a hostile or abusive working environment. *See Lauderdale v. Texas Dep't of Crim. Justice*, 512 F.3d 157, 163 (5th Cir. 2007); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 806 (Tex. 2010) (noting abusive environment is created "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult.'") (citation omitted); *Garcia v. Schwab*, 967 S.W.2d 883, 885 (Tex. App.—Corpus Christi 1998, no pet.). The work environment must be both objectively and subjectively offensive—one that a reasonable person would find hostile or abusive and one that the victim in fact did perceive to be so. *City of Houston v. Fletcher*,

9

166 S.W.3d 479, 489 (Tex. App.—Eastland 2005, pet. denied). In reviewing a hostile work environment claim, we consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance. *Id.*; *Dillard Dep't Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 407 (Tex. App.—El Paso 2002, pet. denied).

The focus of our inquiry is whether the cumulative effect of the offensive behavior is so severe or pervasive that it destroys an employee's opportunity to succeed in the workplace. *See Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 473 (Tex. App.—Austin 2000, pet. denied) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257 (1998); *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 118 S. Ct. 998; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 114 S. Ct. 367, 370–71 (1993); and *Meritor Sav. Bank FSB v. Vinson,* 477 U.S. 57, 64 106 S. Ct. 2399, 2405–06 (1986)). In other words, the sexual harassment is sufficiently "severe" or "pervasive" as to alter the terms, conditions, or privileges of the victim's employment when it can be said to create an "abusive working environment." *See Harris*, 510 U.S. at 24, 114 S. Ct. at 371–72 (Scalia, J., concurring) ("'[A]busiveness' is . . . the test of whether legal harm has been

10

suffered . . . ."). The critical inquiry is environment: evidence of general work atmosphere as well as specific instances of hostility or abuse are important. *See Soto*, 942 S.W.2d at 678. In making this determination, "single incidents should not be viewed in isolation because it is the cumulative effect of all offensive behavior that creates the work environment." *Williams*, 313 S.W.3d at 806; *see Itz*, 21 S.W.3d at 473 ("The critical inquiry is the *environment* . . . .") (quotations omitted).

## 2. *Analysis*

DADS challenges the sufficiency of the evidence supporting the fourth element of Iredia's hostile environment claim—that is, whether the alleged harassment by Sowemimo affected a "term, condition, or privilege" of Iredia's employment. Specifically, DADS argues that Iredia has failed to present a prima facie case of sexual harassment because she has not shown that the alleged conduct was severe or pervasive or that the harassment interfered with her work performance. Iredia contends that she has presented sufficient evidence to create a fact issue regarding the fourth element of her hostile environment claim, and, thus, the trial court has subject matter jurisdiction over her claim.

In her deposition and interrogatory responses, Iredia testified that from 2007 until her termination in 2010, Sowemimo repeatedly called her "skinny," "skeleton," and "skinny bone" in front of her co-workers, and once in front of her

11

son; accused her of not eating and of taking food from an office lunch to her children at home because they did not have food to eat; after calling her a "skinny skeleton," he told her he did not want her to die in his office; told her that no man would want a "skinny bone" like her and that was the reason her husband had left her; stated in Iredia's and her co-workers' presence that he did not like to have sex with skinny women because when he lay on top of skinny women his bones rubbed against their bones and hurt him, but that he liked how it felt to lay on top of fat women; entered Iredia's office by kicking the door open; and constantly told Iredia that he was going to fire her before she was terminated. Iredia also testified that the only days that Sowemimo did not insult her in front of her co-workers was when he was not at work, and that she felt scared working in that environment.

We begin by examining the frequency or pervasiveness of Sowemimo's alleged conduct. Sowemimo was Iredia's supervisor from 2007 until he terminated her employment in 2010. Accepting Iredia's allegations as true, Sowemimo's alleged conduct occurred on a nearly daily basis during an approximately three-year period. According to Iredia, her only harassment-free days were when Sowemimo was absent from work. DADS argues that Iredia's testimony that Sowemimo's conduct was ongoing was conclusory and that there is no other evidence showing that the alleged conduct was pervasive. However, Iredia's testimony regarding the frequency of the alleged conduct is sufficient to

12

demonstrate pervasiveness and she was not required to present other evidence. Further, DADS has not presented evidence to negate this factual allegation. *See Garcia*, 372 S.W.3d at 637 (citing *Miranda*, 133 S.W.3d at 228) (noting that plaintiff will only be required to submit evidence if defendant presents evidence negating basic fact of plaintiff's prima facie case).

DADS also contends that Iredia's allegations, even if true, cannot be considered "severe" under controlling standards. We agree. The conduct of which Iredia complains cannot be considered the sort of objectively severe conduct that would be deemed to alter the terms, conditions, or privileges of Iredia's employment. Other courts have found more egregious uninvited physical and verbal conduct insufficiently severe to alter terms, conditions, or privileges of employment. *See, e.g.*, *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 321–22 (5th Cir. 2004) (plaintiff's supervisor made sexually suggestive remarks to her, repeatedly insisted that she be alone with him, remarked on another employee's body, brushed up against plaintiff's breast and behind, once tried to kiss her, once stood in bathroom doorway while plaintiff was present, and once swatted plaintiff's behind with newspaper over one-and-a-half year period); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872 (5th Cir. 1999) (co-worker touched plaintiff's arm several times, rubbed arm down to her wrist, simulated looking up her dress, tried to look down her clothing, and made sexually

13

suggestive comments that included referring to color of her nipples and size of her thighs); *Garcia*, 967 S.W.2d at 885, 887 (supervisor stared at and commented on plaintiff's breasts, touched his genitals in front of plaintiff, discussed highly personal and sexual matters with plaintiff, remarked on plaintiff's appearance, and repeatedly made sexual references in attempt to sexually arouse plaintiff); *Green v. Indus. Specialty Contractors, Inc.*, 1 S.W.3d 126, 129, 132–34 (Tex. App.— Houston [1st Dist.] 1999, no pet.) (supervisor made numerous sexual comments, including expressing desire to hold "a wet T-shirt contest" with plaintiff as contestant).

However, sexual harassment may give rise to an abusive work environment through either its objective severity *or* its pervasiveness, or some combination of the two. *See Harris*, 510 U.S. at 21, 114 S. Ct. 367. The level of objective severity in harassment necessary to give rise to an objectively hostile work environment may be said to vary inversely with its pervasiveness, and vice versa. *See Lauderdale*, 512 F.3d at 163 ("[T]he test—whether the harassment is severe or pervasive—is stated in the disjunctive. An egregious, yet isolated incident can alter the terms, conditions, or privileges of employment . . . . The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby alerting the terms, conditions, or privileges of employment such that a hostile work environment exists.") (citations omitted).

Several Fifth Circuit decisions are particularly instructive on the issue of pervasiveness. In a recent en banc decision, the Fifth Circuit found a supervisor's sex-based epithets aimed at a subordinate "two-to-three times a day, almost every day, for months on end," to constitute sufficient evidence of severe or pervasive harassment. *See E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 461 (5th Cir. 2013) (en banc). In *Farpella–Crosby v. Horizon Health Care*, the Fifth Circuit found that the plaintiff had presented sufficient evidence from which a jury could have found severe or pervasive harassment where the plaintiff was subjected to offensive, sex-based comments two to three times per week, some comments were made in front of co-workers, and the harassing supervisor threatened the plaintiff with her job on numerous occasions when she asked him to stop making the comments. 97 F.3d 803, 806 (5th Cir. 1996); *cf. E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007) (reversing summary judgment in favor of defendant where plaintiff was subjected to verbal harassment—including nicknames like "Taliban" and "Arab"— on "a regular basis for a period of approximately one year"); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (holding that African–American employees who were subjected to variety of racial slurs over three-year period raised fact issue as to whether slurs were sufficiently severe or pervasive), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006). Here, because Iredia alleged

15

conduct that occurred on a nearly daily basis over a three-year period, the pervasiveness suggests that a less heightened level of severity is required. *See Lauderdale*, 512 F.3d at 163.

We also consider whether the conduct was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work performance. *Fletcher*, 166 S.W.3d at 489; *Gonzales*, 72 S.W.3d at 407. In her deposition, Iredia testified that Sowemimo typically kicked the door of her office open upon entering. She also testified that his constant name-calling disgraced her in front of her co-workers and, on one occasion, in front of her son, that he repeatedly threatened to fire her, and that she felt scared working in that environment.

In its reply brief, DADS urges us to disregard a number of Iredia's allegations because "they are not based on sex and/or gender." However, even if some of the alleged harassing conduct was not overtly sexual in nature, some of it was. According to Iredia, Sowemimo stated that he disliked skinny women because it hurt him when he lay on top of skinny women but that he liked the way it felt to lay on top of fat women, and that no man would want a "skinny bone" like Iredia and that is the reason her husband left her. Further, even the comments which were not overtly sexual, such as calling Iredia "skinny skeleton" and "skinny bone," could be considered sexual under some circumstances, particularly

16

in light of Sowemimo's statements equating Iredia's size with her alleged sexual undesirability.[5]

The critical inquiry is environment—we do not consider single incidents alone, but rather the cumulative effect that these incidents have on the overall environment. *See Itz*, 21 S.W.3d at 473; *Soto*, 942 S.W.2d at 678. The evidence is undisputed that Iredia personally perceived her work environment to be hostile because of Sowemimo's conduct. We also find that a reasonable person could have found the work environment to be hostile or abusive. *See Lauderdale*, 512 F.3d at 163; *Fletcher*, 166 S.W.3d at 489. Because Iredia has alleged sufficient facts to raise a fact issue regarding whether the complained-of conduct altered the terms, conditions, or privileges of her employment and created an abusive working environment, the trial court has subject matter jurisdiction to hear her claim. *See Miranda*, 133 S.W.3d at 226. We overrule DADS's first issue.

## D. Race/National Origin Discrimination

To allege a claim of race or national origin discrimination based on disparate treatment under Chapter 21, a plaintiff must first present a prima facie case.

---

[5] "[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80–81, 118 S. Ct. 998 (1998). Further, the conduct underlying a sexual harassment claim need not be overtly sexual. *See Soto v. El Paso Natural Gas Co.*, 942 S.W.2d 671, 677 (Tex. App.—El Paso 1997, pet. denied) (noting that "[h[arassment based on gender need not take the form of a sexual advance or contain otherwise carnal overtones to constitute prohibited sex discrimination.").

17

*Reeves*, 530 U.S. at 142, 120 S. Ct. 2097. Specifically, a plaintiff must show that she was (1) a member of a protected class, (2) qualified for the employment position at issue, (3) subject to an adverse employment action, which includes termination, and (4) treated less favorably than similarly situated members outside of the protected class. *Reeves*, 530 U.S. at 142, 120 S. Ct. 2097; *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005).

In its plea to the jurisdiction, DADS challenged the fourth element of Iredia's race and national origin discrimination claim. Specifically, it argued that Iredia had failed to show that she was treated less favorably than other similarly situated employees outside of the protected classes. In her petition, Iredia alleged that Sowemimo treated her differently than similarly situated employees who also made mistakes in the performance of their job. In her deposition, she testified that Sowemimo treated other QMRPs more favorably than her by allowing them to represent the unit in his absence even though Iredia had more seniority, and she identified "Cassandra" as one of the QMRPs treated more favorably than her. However, these allegations do not affirmatively demonstrate that Cassandra or the other QMRPs to whom Iredia refers were outside of the protected class and that they were similarly situated to Iredia. *See Monarrez*, 177 S.W.3d at 917 (noting "[e]mployees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct").

Iredia argues that DADS's plea to the jurisdiction with respect to her race and national origin discrimination claim is premature because she intends to conduct additional discovery which will generate evidence to support her claim. Notwithstanding her argument, Iredia has failed to meet her burden to allege facts that affirmatively demonstrate the trial court's jurisdiction to hear her race and national origin discrimination claim. Accordingly, we sustain DADS's second issue.

## Conclusion

We affirm the trial court's order denying DADS's plea to the jurisdiction with respect to Iredia's sex discrimination claim, and we reverse the trial court's order with respect to her race and national origin discrimination claim and dismiss the claim for lack of subject matter jurisdiction.

Jim Sharp
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

19