# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 6, 2022

Lyle W. Cayce
Clerk

No. 21-30451

Ocheowelle Okeke, Doctor,

*Plaintiff—Appellant*,

*versus*

Administrators of Tulane Educational Fund,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:20-CV-450

Before Stewart, Clement, and Elrod, *Circuit Judges*.

Per Curiam:*

The plaintiff in this case brought three types of Title VII claims against the Administrators of the Tulane Educational Fund (Tulane), alleging that she was discriminated against because of her race and sex while a resident at the medical school. Because she has failed to satisfy at least one necessary

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

element for each of her claims, we AFFIRM the district court's grant of summary judgment to Tulane on all of the claims.

## I.

Plaintiff Dr. Ocheowelle Okeke is licensed to practice medicine in the State of Missouri. She attended Tulane's Combined Residency Program in Internal Medicine and Pediatrics (Med-Peds) from 2014 to 2018. After completing the program, Dr. Okeke became a board-certified specialist in both internal medicine and pediatrics, and she obtained her top-choice fellowship in rheumatology at the University of St. Louis School of Medicine. She brought this Title VII lawsuit alleging that she, a Black physician, suffered race and gender discrimination and a hostile work environment during her time at Tulane.

## A.

The facts that Dr. Okeke alleges to support her claims generally can be sorted into two categories: (1) those suggesting that she was treated poorly regarding scheduling; and (2) those suggesting racial prejudice on a more personal or social level.

First, the scheduling facts: As background, when Dr. Okeke rotated through the Internal Medicine program during her Med-Peds residency, most of the Internal Medicine residents—and the program director—were White. However, the Med-Peds program director, Dr. Princess Dennar, was the first Black-woman program director and brought in an entirely minority-female resident class for the Med-Peds program, of which Dr. Okeke was a member. Dr. Okeke asserts that she and other minority-female residents were given harder rotations and poorer educational and employment experiences by the Internal Medicine program director compared to White-male Internal Medicine residents. Specifically, she claims that Dr. Jeffrey Wiese, a White-male director of the Internal Medicine program, seized

No. 21-30451

authority over Med-Peds residents' schedules (an authority which, she says, belonged to Dr. Dennar) and: (1) prevented Dr. Okeke from completing four weeks of rotation in the Emergency Department; and (2) in general assigned the minority-female residents of the Med-Peds program to harder rotations and less training. She claims that she spent considerably more time working in inpatient wards and on harder rotation teams compared to White-male residents in Internal Medicine. Dr. Okeke contends that these actions prevented the Med-Peds residents from meeting graduation requirements set by their program director[1] (however, Dr. Okeke was certified for graduation and she graduated on time).

Next, the other facts which Dr. Okeke claims demonstrate racial prejudice at a personal level by other doctors associated with the Internal Medicine program: She presented testimony from Dr. Dennar that a White-male faculty member assumed that Dr. Okeke failed her STEPS,[2] and that during applicant review he often would make that assumption when he would see the picture of a Black person's face. Dr. Dennar also testified that although Dr. Wiese and the residency programs chairman would typically send congratulations to Dr. Dennar whenever a new class of residents was "match[ed]," she received no such congratulations upon the matching of Dr. Okeke's all-minority-female class. The chairman instead expressed that in the future they needed to review the metric used to rank applicants.

---

[1] Similarly, she asserts that the scheduling actions prevented her from "moonlighting"—a privilege which residents can sometimes take advantage of and which allows them to earn some extra money by working additional time.

[2] "STEPS" are criteria from the United States Medical Licensing Examination used for residency ranking.

No. 21-30451

Dr. Wiese stated in an e-mail to the chair of Internal Medicine that he was considering reducing the number of Med-Peds residents from six to four in the upcoming year.  He explained his reasoning in the e-mail:

> There are also some cultural issues that are arising out of the med-peds program because of, I believe, some excessively elevated expectations (and when those excessively elevated expectations are not met, people are unhappy).  Having a more manageable number might allow addressing those expectations.

Dr. Okeke asserts that this statement about "cultural issues" actually reflects a displeasure from Dr. Wiese with the all-minority-female nature of the Med-Peds resident class.

She also points to some occasions in which she believes Dr. Wiese failed to give her proper recognition.  She claims that Dr. Wiese did not know her name on one occasion and at another point initially left her out of an e-mail congratulating all residents who obtained a fellowship.  And she points to an incident in which, after Dr. Okeke and some co-residents complained about harder rotations, Dr. Wiese told them, "I control the schedule, and you need to be team players."  On a similar note, Dr. Dennar reports an occasion in which an assistant program director contacted Dr. Dennar and described Dr. Okeke as angry and difficult to deal with.  Ultimately, though, no one reported such a thing about Dr. Okeke in any written evaluation.

In response to Dr. Okeke's claims, Tulane presents these facts:

First, Tulane claims that Dr. Okeke is simply wrong that she was treated poorly as to scheduling compared to similarly situated parties.  The residency program, Tulane explains, is intense, condensing six years' worth of specialty training into four.  Tulane contends that Dr. Okeke is mistaken that the amount of emergency training she received was deficient.  Although the Accreditation Council on Graduate Medical Education (ACGME)

4

provides accreditation standards for residency programs to satisfy, much of the scheduling is driven institutionally by Tulane and the needs of its partner hospitals.

To that end, for the Internal Medicine rotation, residents are assigned to a "firm" or "learning community" made up of Internal Medicine residents or residents and interns who, like Dr. Okeke, are part of a combined program like Med-Peds. At any given time, four out of the five "firms" work in hospitals and one works in the clinics. The harder and easier rotations are divided among the firms in a generally equal manner, and within Dr. Okeke's firm (Red Firm), the more difficult rotations generally were spread evenly. At a more detailed level, residents had some degree of agency over their schedules—after the first year, there was a process for residents to seek their preferred weeks for the various rotations and for time off.

Tulane asserts that Dr. Okeke participated in this scheduling process and was able to select and complete every rotation she asked for. It also presented testimonial evidence that her time in the more difficult rotations was consistent with that of the Internal Medicine residents in her same firm.

As for the issue of whether Dr. Okeke was deprived of adequate emergency room training, Tulane posits that her training satisfied ACGME standards. It notes that although it is a "core requirement" that Med-Peds residents get exposure to emergency medicine, it is merely a "detail requirement" that they complete at least four weeks of such training. In other words, while all residents receive at least two weeks in the emergency room, Tulane may fill the additional two weeks with rotations which involve emergency exposure through other means. Indeed, it is the norm for Tulane residents to receive only two weeks of specific emergency department rotation. Thus, Dr. Okeke did receive four weeks' worth of emergency training and satisfied all ACGME requirements.

No. 21-30451

Perhaps most significantly, Tulane notes that Dr. Okeke completed her residency program on time, received all her stipends, graduated, became certified in both internal medicine and pediatrics, and obtained her first-choice fellowship.

### B.

In April 2018, Dr. Okeke and some of her co-residents complained of discrimination to the ACGME and asked it to intervene. The ACGME conducted an investigation and found no evidence of any discrimination or Title VII violations. Dr. Okeke also made a complaint to Tulane's Office of Institutional Equity, which likewise conducted an investigation and found no evidence of any discrimination in violation of Tulane's policies. She also filed a charge with the EEOC, which did not take up her case.

Dr. Okeke received her right-to-sue letter from the EEOC and then sued Tulane, claiming race and gender discrimination under disparate-treatment and disparate-impact theories, and a hostile work environment, in violation of Title VII. After discovery, Tulane moved for summary judgment on Dr. Okeke's claims of disparate treatment and hostile work environment. It moved separately for summary judgment on Dr. Okeke's disparate-impact claim. The district court granted summary judgment in favor of Tulane on all the claims.

### II.

Dr. Okeke has not presented evidence sufficient to survive summary judgment for any of her three Title VII claims. We therefore affirm the district court's grant of summary judgment to Tulane on all the claims.

### A.

We review a district court grant of summary judgment *de novo*. *Martinez v. Tex. Workforce Comm'n, C.R. Div.*, 775 F.3d 685, 687 (5th Cir.

2014).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Relatedly, summary judgment is appropriate when the nonmoving party fails to establish an essential element of that party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In such circumstances, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323 (internal quotations omitted).

## B.

Dr. Okeke appeals the district court's grant of summary judgment to Tulane on her claim of disparate-treatment race discrimination under Title VII.  The district court granted summary judgment to Tulane on this claim because it concluded that Dr. Okeke failed to present direct evidence of discriminatory motive, failed to show that she suffered an adverse employment action, and failed to show that she was treated less favorably than her counterparts who are not part of her protected group.  Because we agree that Dr. Okeke failed to demonstrate that she suffered an adverse employment action, we affirm the district court's grant of summary judgment on her disparate-treatment claim.

Title VII prohibits an employer from discriminating against an employee regarding conditions or privileges of employment because of the employee's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a).  Under the disparate-treatment theory of employment discrimination, a plaintiff "must show disparate treatment and discriminatory motive." *Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir. 1988).  A plaintiff may support her claim by presenting

No. 21-30451

either direct or circumstantial[3] evidence of discriminatory motive. *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019). But either way, the plaintiff must ultimately demonstrate that she was subjected to an adverse employment action because of the discriminatory motive. 42 U.S.C. § 2000e-2(a)(1) (identifying as an unlawful employment practice an employer's discrimination "against any individual *with respect to his compensation, terms, conditions, or privileges of employment*" (emphasis added)); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 523–24 (1993) (explaining that Title VII awards damages "only against employers who are proven to have taken adverse employment action by reason of [the protected characteristic]").[4]

---

[3] If the plaintiff provides only circumstantial evidence of discrimination, she can shift the burden of production to the defendant to show a nondiscriminatory reason for the employment action if she can otherwise satisfy all the elements of a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Those elements are that the plaintiff:

> (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group.

*McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). If the defendant meets its subsequent burden to show a legitimate nondiscriminatory reason for the adverse employment action, then the burden of production shifts back to the plaintiff again to prove that the reason proffered by the employer was pretextual. *McDonnell Douglas*, 411 U.S. at 802, 804–05.

[4] *See also Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015) (explaining that a plaintiff bringing a Title VII discrimination claim must show that the employer's discriminatory motive was a motivating factor "for an adverse employment action"); *Peterson v. Linear Controls, Inc.*, 757 F. App'x 370, 374 (5th Cir. 2019) (holding that even though the plaintiff may have presented direct evidence of racial animus, the plaintiff's Title VII discrimination claim was properly dismissed because he "was not subjected to an adverse employment action"); *Brown v. Liberty Mut. Gr., Inc.*, 616 F. App'x 654, 658 (5th

Dr. Okeke argues that she has offered both direct and circumstantial evidence of discriminatory motive. But even if she has offered direct evidence, she has failed to demonstrate that she suffered an adverse employment action.

Dr. Okeke points to the e-mail sent by Dr. Wiese discussing "cultural issues arising out of the med-peds program" as direct evidence of discriminatory motive. The e-mail includes the following:

> I do think that our long-term goal for next year is to reduce Med-Peds to 4 positions a year. It is hard to have a combined program (med-peds) that is larger than the primary program (peds). . . . I cannot functionally use the med-peds residents at the VA (i.e. Continuity clinics), and that leaves us with a GME deficit on the medicine half of their time, as the medicine program is more and more dependent upon the VA.

> There are also some cultural issues that are arising out of the med-peds program because of, I believe, some excessively elevated expectations (and when those excessively elevated expectations are not met, people are unhappy). Having a more manageable number might allow addressing those expectations.

Even assuming *arguendo* that the reference to cultural issues could be interpreted as racial, that would not create an issue of *material* fact, as Dr. Okeke has not suffered an adverse employment action as required to succeed on a disparate-treatment claim. Dr. Okeke alleges that she suffered an adverse employment action because she had a "harder workload resulting in lack of material training, lack of moonlighting compensation opportunity, and loss of vacation time benefit . . ." and because she "was unable to

---

Cir. 2015) ("As with a discrimination claim, a Title VII retaliation claim requires an adverse employment decision.").

complete the Med[]-Peds program requirements."  Tulane responds that each of these alleged facts is either simply incorrect or does not qualify as an adverse employment action under Title VII.  We agree with Tulane.

We first set aside Dr. Okeke's contention that she was unable to complete the program requirements.  She was.  She was certified for graduation and graduated on time, and she had no issue obtaining certification to practice in both internal medicine and pediatrics.

As for the other contentions, we agree with Tulane that they do not qualify as adverse employment actions under Title VII.  Such actions traditionally "include[d] only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating."  *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)).  But the Supreme Court has held that in the context of Title VII retaliation claims, a "materially adverse" action like being reassigned to an unquestionably worse job may be actionable even if not an ultimate employment decision.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61, 68, 70–71 (2006).  Similarly, in the context of substantive claims of discrimination under Title VII, we have explained that changes in job responsibilities may qualify if they amount to "the equivalent of a demotion" to an objectively worse role.  *Thompson v. City of Waco*, 764 F.3d 500, 503–05 (5th Cir. 2014).  But we have specifically held that "[m]erely changing working hours or imposing a higher workload does not qualify" as an adverse employment action under Title VII.  *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 217 (5th Cir. 2016).

Thus, Dr. Okeke's assertions regarding her schedule or working conditions, lack of moonlighting opportunities (as a result of the alleged harder schedule), and loss of some vacation time do not amount to adverse employment actions.  She was not moved into a less prestigious role or a role

with fewer or less-significant responsibilities; her pay was not decreased and her total hours were not changed.  Although she asserts that she spent more time in harder rotations and had to use some vacation time when she did not want to, she has presented no evidence that such treatment was in any way inconsistent with the job description and responsibilities assigned from the beginning to her and other residents.  That being so, Dr. Okeke has failed to demonstrate that she has suffered an adverse employment action,[5] and so she cannot make a claim for disparate treatment under Title VII.  We affirm the district court's grant of summary judgment in Tulane's favor on that claim.

## C.

Dr. Okeke also appeals the district court's grant of summary judgment to Tulane on her claim of a hostile work environment under Title VII.  The district court granted summary judgment to Tulane because it concluded that the actions which Dr. Okeke alleges supported her claim were not sufficiently severe or pervasive to sustain the claim.  We agree with the district court and affirm its grant of summary judgment to Tulane on Dr. Okeke's hostile work environment claim.

To support her hostile work environment claim, Dr. Okeke alleges that Dr. Wiese "yelled" at her and others for raising scheduling issues; that she was subjected to a harder work schedule; that Dr. Wiese forgot her name once and omitted her from a congratulatory e-mail; and that some other faculty members made negative assumptions or remarks about her.  Tulane responds that the district court was correct that none of these acts, separately or combined, are sufficiently severe or pervasive for her claim to succeed, and

---

[5] Because we conclude that Dr. Okeke has not shown an adverse employment action—the third element of a *prima facie* case of disparate treatment under Title VII—we need not address whether the fourth element is satisfied: whether she was treated less favorably than a similarly situated person.

No. 21-30451

asserts that none of the perceived slights against her were linked to her status as a member of a protected class.

A plaintiff employee bringing a hostile work environment claim under Title VII based on a supervisor's conduct must show

> (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome . . . harassment; (3) that the harassment was based on [a protected characteristic]; and (4) that the harassment affected a "term, condition, or privilege" of employment.

*E.E.O.C. v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 453 (5th Cir. 2013) (*en banc*) (quoting *Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 162–63 (5th Cir. 2007)). "For harassment . . . to affect a term, condition, or privilege of employment, as required to support a hostile work environment claim under Title VII, it must be 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Thus, we consider the frequency and severity of the alleged conduct, as well as whether "it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000) (quoting *Harris*, 510 U.S. at 23).

The conduct to which Dr. Okeke points was not sufficiently severe or pervasive to sustain a hostile work environment claim. Even if all her allegations are true, working a hard schedule, being scolded as part of a group for not being a team player regarding scheduling, and having someone forget to include her or say her name on a couple occasions are neither severe nor pervasive conduct in the context of a rigorous four-year combined residency program. And even if some other faculty had inappropriately made

No. 21-30451

assumptions about her qualifications, it was a supervisor and not Dr. Okeke who knew about it at the time.

From the record, then, it is clear that at the most Dr. Okeke was subjected to the occasional "mere offensive utterance" and not to pervasive or severe conduct that would unreasonably interfere with job performance. *See id.* As we have said before, it is not enough to simply show that "colleagues were sometimes offensive and boorish. . . . Title VII does not impose a 'general civility code' on employers." *West v. City of Houston*, 960 F.3d 736, 743 (5th Cir. 2020) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). And as for the alleged harsher scheduling, being "directed to perform tasks that fell within [the] job description" generally is insufficient to sustain a hostile work environment claim. *Peterson v. Linear Controls, Inc.*, 757 F. App'x 370, 375 (5th Cir. 2019); *see also Hobbs v. City of Chicago*, 573 F.3d 454, 464 (7th Cir. 2009) ("No reasonable jury could conclude that being assigned duties that were part of one's job description . . . amount[s] to a hostile work environment.").

Because Dr. Okeke cannot satisfy the requirement that "the harassment affected a 'term, condition, or privilege' of employment," *see Boh Bros.*, 731 F.3d at 453, we affirm the district court's grant of summary judgment to Tulane on the hostile work environment claim.[6]

## D.

Finally, Dr. Okeke appeals the district court's grant of summary judgment to Tulane on her disparate-impact claim. In support of her claim, she points to the same evidence which allegedly shows that she and other

---

[6] Because we hold that Dr. Okeke has not shown that she suffered harassment that affected a term, condition, or privilege of employment, we need not address whether any alleged harassment was based on a protected characteristic.

minority women from the Med-Peds program were treated less favorably regarding scheduling when rotating through Internal Medicine. The district court granted summary judgment to Tulane on this claim because it concluded that Dr. Okeke did not specifically identify a "particular, facially neutral policy or practice" of Tulane, and because she failed to show "disparate effects and causation" from any such practice. We agree with the district court that Dr. Okeke has failed to identify a particular, facially neutral policy of Tulane that brought about a disparate impact. We thus affirm the grant of summary judgment to Tulane on Dr. Okeke's disparate-impact claim.

A disparate-impact claim differs from a disparate-treatment claim. While, as discussed above, a disparate-treatment claim must include an allegation of intentional discrimination, a disparate-*impact* claim targets employer practices that "are not intended to discriminate but in fact have a disproportionately adverse effect on minorities." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). To sustain a disparate-impact claim under Title VII, a plaintiff must (1) identify a specific, facially neutral policy or practice of the employer, and (2) show that the policy or practice has caused a disproportionately adverse effect on a protected class. *Pacheco v. Mineta*, 448 F.3d 783, 791 (5th Cir. 2006); *Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 799–802 (5th Cir. 1982).

It is critical that the plaintiff identify "the specific employment practice that is challenged." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 357 (2011) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)). "Thus, '[t]he disparate impact model applies only when an employer has instituted a specific procedure, usually a selection criterion[,] . . . that can be shown to have a causal connection to a class based imbalance . . . .'" *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1284 (5th Cir. 1994) (quoting *Pouncy*, 668 F.2d at 800).

No. 21-30451

Dr. Okeke has failed to identify a specific employment practice that purportedly caused her to work a harder schedule. She has alleged that Dr. Wiese took over the scheduling authority for Med-Peds residents that belonged to Dr. Dennar. But she has not pointed to any such policy or practice that has brought about a disparate impact based on race. If, for instance, she had presented evidence that in finalizing schedules Dr. Wiese applied some sort of *criteria* that resulted in less favorable schedules for the minority-female Med-Peds residents, this might be a different case. As it is, Dr. Okeke has only presented evidence that Dr. Wiese's involvement in scheduling arguably led to an undesirable result for her.[7]

Because Dr. Okeke has not satisfied the requirement for disparate-impact claims that she identify a specific, facially neutral policy used by Tulane, we affirm the district court's grant of summary judgment to Tulane on this claim.

---

[7] Dr. Okeke asserts that she need not point the blame on one specific policy. For that position, she cites Title VII's directive that "if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i). In her view, then, she need only assert that the scheduling process overall has had a disparate impact. We disagree. Dr. Okeke has not demonstrated that elements of Tulane's scheduling process "are not capable of separation for analysis." In fact, she *has* separated them: She has explained that the first stage of scheduling involves an objective "snake draft" in which more senior residents gets preference; and then, she asserts, Dr. Wiese changed the schedules before final publication. It is Dr. Wiese's involvement which she alleges caused a disparate impact. And even if Dr. Okeke had alleged a specific policy of Tulane, she has not shown that any disparate impact she has experienced regarding scheduling reflects a racial disparity.

No. 21-30451

\*          \*          \*

We AFFIRM the judgment of the district court granting summary judgment to Tulane on Dr. Okeke's Title VII claims of disparate treatment, hostile work environment, and disparate impact.